**Philip J. HIRSCHKOP**

v.

**The VIRGINIA STATE BAR et al., Defendants.**

**Civ. A. No. 74–0243–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

July 30, 1976.

Philip J. Hirschkop, Alexandria, Va., Richard C. Shadyac, Annandale, Va., Jeremiah S. Gutman, New York City, for plaintiff.

Anthony F. Troy, Deputy Atty. Gen., Richmond, Va., for defendants.

John W. Riely, James E. Farnham, Jack E. McClard, Richmond, Va., for Snead, I'Anson, Carrico, Harrison, Harman, Cochran and Poff.

## MEMORANDUM ORDER

WARRINER, District Judge.

This action seeks a declaratory judgment that Disciplinary Rule DR7–107 of the Code of Professional Responsibility, as adopted by defendant Supreme Court of Virginia, is facially unconstitutional.

Plaintiff, Phillip J. Hirschkop, is an attorney duly licensed to practice law in Virginia. As an attorney he is required to be and is a member of the Virginia State Bar. Va. Code Ann. §§ 54–42 *et seq.* (Repl.Vol. 1974). As a member of the Bar, his conduct is governed by the Code of Professional

**1140**

Responsibility which includes DR–7–107, the disciplinary rule in issue.

Defendant Supreme Court of Virginia adopted the Code on 23 October 1970 and made it applicable to all members of the Virginia State Bar on 1 January 1971. The Supreme Court acted pursuant to Va. Code Ann. § 54–48(b) (Repl.Vol.1974) which authorizes the Court to promulgate "a code of ethics governing the professional conduct of attorneys" and which charges the Court with the responsibility of prescribing and overseeing the procedure for disciplining, suspending and disbarring attorneys who violate any of the Code's provisions.

Jurisdiction is attained pursuant to 28 U.S.C. §§ 1343(3), 2201; 42 U.S.C. § 1983; and the First and Fourteenth Amendments.

I

CASE OR CONTROVERSY

Preliminary to consideration of the merits of plaintiff's complaint as to the constitutionality of DR–7–107 the Court directs its attention to whether or not a "case or controversy" still exists herein within the meaning of Art. III, § 2 of the Constitution and of the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

Prior to the outset of this suit complaints had been instituted before appropriate ethics committees of the Virginia State Bar alleging violations by plaintiff of DR–7–107. As the Court interprets the initial pleadings, plaintiff asked this Court to declare DR–7–107 unconstitutional and make a finding of fact that, notwithstanding this infirmity, it had been selectively or conspiratorially enforced against him in violation of his constitutional rights.

During the pendency of this case a compromise and settlement was reached between certain of the parties on all matters except the constitutionality of DR–7–107 upon which the matter proceeded as against the Supreme Court of Virginia, only. As a part of the settlement agreement defendant Virginia State Bar acknowledged that the grounds upon which past ethics charges had been lodged against plaintiff did not consti-

tute violations of DR–7–107 and that the charges appeared to have had arisen in cases where complainants may have disagreed with the causes supported and espoused by plaintiff. Further, it was agreed that all parties defendant to this action other than the Supreme Court of Virginia would be, and accordingly were, dismissed.

■ The Court, having considered *sua sponte* the possibility that the controversy between the parties herein may have become moot upon the resolution of the controversy between plaintiff and the now dismissed defendants, concludes that it has jurisdiction to decide the merits of the request for declaratory relief. The question is "whether the facts alleged under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

■ The admission in the settlement agreement that "an unusual number of complaints" under DR–7–107 had been filed against plaintiff would justifiably cause him apprehension that more complaints may be filed against him in the future. The settlement agreement does not preclude such complaints. Successful prosecution of such complaints could well result in grave consequences to plaintiff. Under these circumstances, the Court finds that the controversy remains sufficiently substantial, immediate and real so as to require retention of jurisdiction. *See, Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1964); *Southern Pacific Terminal Co. v. I. C. C.*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

II

HISTORY OF DR 7–107

The genesis of DR 7–107 was the mandate laid down by the United States Supreme Court, speaking through Mr. Justice Clark, in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) that:

The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors [nor] counsel for defense . . . should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures. 384 U.S. at 363, 86 S.Ct. at 1522, 16 L.Ed.2d at 620.

The American Bar Association, (ABA) had already taken the initiative by creating an Advisory Committee on Fair Trial and Free Press which, in effect, was assigned the task of formulating regulations that would implement the directives of *Sheppard*.[1]

The Committee studied the available literature. It sent a representative to England to study how the problem was dealt with there. It also made extensive studies of the problem in three sample cities and less extensive studies in 20 others. Judges, prosecuting attorneys and defense counsel were interviewed and responded to questionnaires with regard to the effect of counsels' comments on potential or actual jurors, albeit no empirical data was accumulated to determine what actually prejudiced jurors. Further, a number of meetings were held with news media representatives and law enforcement agencies. After this survey a tentative draft of the regulation was distributed. Eight thousand copies were forwarded to various presumably interested individuals and organizations, among those were the A.C.L.U. and various news media organizations.

All suggestions that resulted from this distribution of the draft were considered and a series of additional meetings was held by the Committee in which the initial draft was amended numerous times. The Committee subsequently approved a final draft of regulations from which DR 7–107 of the Code of Professional Responsibility was drawn.[2] Thereafter the Code was approved by the ABA and was adopted by virtually every State, including Virginia.

### III

### DR 7–107 INVOKES STATE ACTION

If all we had were Bar adopted ethical standards this case would be before us in a

---

**1.** The Committee came into existence prior to *Sheppard* in September of 1964. It was "charged to consider the impact of news reporting on the administration of criminal justice and to seek methods of preserving and strengthening the right of a fair trial without abridging freedom of speech and of the press." *American Bar Association Project on the Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press*, p. 1 (Tentative Draft 1966) [hereinafter Reardon Report].

During the pendency of the Committee's research and analysis the *Sheppard* decision came down. It had an obvious impact on the Committee which cited the opinion and incorporated many of its directives in the Committee's proposals.

The Committee concluded that an accommodation is possible which will give full force and effect to the guarantees of the First and Sixth Amendments—the adoption of limitations, carefully defined as to content and timing, on the release of information bearing on the apprehension and trial of criminal defendants by members of the bar and by law enforcement agencies, with appropriate remedies available when there is a showing that a fair trial has been jeopardized. *Id.*

This was essentially the policy of Canon 20 of the Canons of Professional Ethics, which was in existence prior to the Committee's endeavors, but the Committee felt that its general language failed to give adequate guidance and acknowledged that it theretofore had not be enforced. *Id.* at p. 80. Canon 20 reads as follows:

Newspaper publications by a lawyer as to a pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond quotation from the records and papers on file in the Court; but even in extreme cases it is better to avoid any ex parte statement.

**2.** The final draft of the Reardon Report was approved by the ABA House of Delegates at its mid-winter meeting in February 1968. This draft and DR 7–107 are reproduced in the appendix herein. *See,* p. A–1, *supra.*

decidedly different posture since the Bar can (and should) voluntarily provide ethical guidelines for the conduct of lawyers in the interest of justice. Indeed, it may well be that the best policy for all lawyers to follow would be that one adopted by many if not most lawyers—many of them the best we have—that no matter in litigation may ever be the subject of comment to the press. Most lawyers hold strictly to the concept of trial in the courtroom, not on the T.V. tube. *See* Reardon Report at p. 81. (Tentative Draft 1966).

Energy, thought and effort expended in public relations campaigns is more often for the pecuniary and ego benefit of the lawyer and at the expense of the best interests of his client—though there may be exceptions to this rule. There is a cult of lawyers who have sought and received nationwide notoriety and have attracted thereby lucrative clients. It could be that such lawyers are particularly interested in securing First Amendment rights to publicize themselves. Other lawyers may sincerely believe that justice cannot be found in the courtroom unless coerced by the power of the popular press.

But we are not dealing with voluntary ethical standards nor are we dealing with motivations. We are dealing with Disciplinary Rules adopted by the Supreme Court of Virginia and imposed with the force of law on all lawyers in Virginia. Va. Code Ann. § 54–48 (Repl.Vol.1974). Under these circumstances, we must concern ourselves not with what lawyers should do but instead what they are constitutionally permitted to do.

---

**3.** Reardon Report, p. 82 (Tentative Draft 1966).

**4.** The Reardon Proposal is not in issue in this case but it is the source from which DR 7–107 was drawn and full explication of all issues requires that they both be dealt with.

**5.** It is unclear whether or not criminal bench trials were contemplated by the Committee in reaching its proposal. Judge Meyer testified that bench trials were considered. The Court does not doubt the sincerity of his opinion but, in reviewing all the drafts and recommenda-

The Reardon Committee considered the constitutional implications of their proposals and concluded that they raise no constitutional problem.[3] Mr. Hirschkop differs with the Committee's conclusion. His position, as the Court perceives it, is that the Reardon proposal[4] is unconstitutionally vague and overbroad and that, *a fortiori*, DR–7–107 suffers from the same infirmities as it not only incorporates these speech restrictions but extends them to cover juvenile and administrative hearings and civil jury and bench trials notwithstanding the fact that these areas were not within the scope of the research and analysis upon which the Committee's proposal was based.[5]

## IV

## VAGUENESS AND OVERBREADTH

### A. Traditional Analysis

Plaintiff's labeling of this cause as a vagueness and overbreadth case invites us to apply procedural and substantive due process analysis in the First Amendment context as the Supreme Court has done in a long line of First Amendment cases[6] and as the 7th Circuit has done with respect to DR–7–107.[7] The accepted phrases of art used with respect to these issues are that the language of the regulation must be clear, precise, narrowly tailored and the least drastic means to achieve a constitutionally permissible end. The Courts, however, have wisely acknowledged the difficulty in drafting regulations both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of

---

tions by the Committee finds that, although some members of the Committee may have considered bench trials, it was not in the contemplation of the Committee as a whole.

**6.** *E.g. Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

**7.** *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975).

conduct are prohibited[8] and thus qualified the above phrases of art to the extent that regulatory language be "set out in terms that the ordinary person exercising common sense can sufficiently understand and comply with."[9] It also has been recognized that a statute may be overbroad "even though clear and precise if it nevertheless prohibits constitutionally protected conduct."[10] Mr. Hirschkop contends, in effect, that, notwithstanding the above-mentioned judicial gloss put on these phrases, DR–7–107 is unconstitutional because it is unclear, imprecise, not narrowly tailored and too drastic.

### B. Significance of Dealing with Conflicting Constitutional Rights

These are the issues in a sense. But the meaning of these words are totally dependent upon the context in which they are used. Thus, pursuing this analytical approach without further explication of the posture of this case we believe would be deceptively over-simplistic and lead the Court far astray from reaching the proper conclusions. The multitude of seemingly disconnected points of argument presented in counsel's brief attest to our apprehension. Before we proceed further we must bring all the many considerations to be dealt with under one roof so that we may fully appreciate and make clear how they weigh into the decision of the constitutionality of DR 7–107 with respect to the charges of vagueness and overbreadth and in so doing develop the proper context in which to address these charges.

Mr. Justice Holmes, attempting to connote the right to freedom of speech, posited:

All rights tend to declare themselves absolute to their logical extreme. . . . all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular

right is founded, and which become strong enough to hold their own when a certain point is reached. . . . The boundary at which the conflicting interests balance cannot be determined by any general formula in advance. *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

The First Amendment is not absolute in any sense and it is feckless to declare it such where it is competing with another fundamental constitutional right. The Court is bound to say that plaintiff's initial and pervading contention that the First Amendment is absolute flies in the face of right, reason, logic, history—and the law. It weakens his whole case.

The overriding issue in this case, the roof under which all points of argument should be considered, must be, and is, when must First Amendment rights give way to Fifth and Sixth Amendment rights to a fair trial and, when it gives way, how far must it give?

There are differing situations and the "give" under ordinary circumstances of the First Amendment right to free speech must be limited to reasonable restrictions as to time, manner and place insofar as is essential to accommodate a conflicting interest. *Grayned v. City of Rockford,* 408 U.S. 104 at 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Significantly, the conflicting interest here is the right to a fair trial—called, with some degree of hyperbole perhaps, "the most fundamental of all freedoms." *Estes v. Texas,* 381 U.S. 582 at 540, 85 S.Ct. 1628, at 1632, 14 L.Ed.2d 543 (1965). Indeed some Courts, the 7th Circuit among them, have addressed the precise point and have concluded that the right to a fair trial is superior to the right of free speech and that where the two collide the latter must give way to the former. *E. g. Chicago Council of Lawyers*

8. *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed. 584 (1972).

9. *United States Service Commission v. Nat'l Assoc. of Letter Carriers,* 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973).

10. *Karlan v. 10 Cincinnati,* 416 U.S. 923, 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974) (Douglas, J., dissenting).

*v. Bauer,* 522 F.2d 242, 248 (7th Cir. 1975). This Court need not and does not go that far for the history of DR 7–107 reveals a thoughtful balancing process between the two.[11]

In order to determine the reasonableness of the give required by DR 7–107 with respect to the charges of vagueness and overbreadth we must determine what is constitutionally protected under the right to a fair trial and what is constitutionally protected under the right of free speech *in the area where these rights are in conflict.* We must further determine whether DR 7–107 ensures that which is protected under the former without *unreasonably* infringing upon that which is protected under the latter. In other words, we must resolve whether or not the give required by DR 7–107 is reasonable in light of that which is necessitated by resolution of the conflict. We have already established that some give is indeed required; by necessity in resolving this conflict the extent of constitutional protection afforded by each of these rights *must* be diminished from what it would otherwise be but for the conflict. Determining the extent of protection of these rights in the conflict area is in essence the same as determining what constitutes a reasonable give or diminution of the protection otherwise afforded by these rights but for said conflict. In order to make this determination a balance must be struck by weighing all relevant considerations which constitute the substance of these rights toward the end of keeping each of them as much as humanly possible intact. DR 7–107 represents an attempt to do just that. In so doing it drew a boundary line in the area of conflict between the right of free speech and that of a fair trial diminishing what would otherwise be constitutionally protected areas but for the interference of the opposing conflicting right.

So what one really is asking when one raises the charges of vagueness and overbreadth in this context is whether or not the boundary is reasonably clear and rea-sonably precise on the First Amendment side of the line and whether or not the line itself is unreasonably broad or cuts too drastically into otherwise speech protected territory.

## C. Analysis of Charges in Fair Trial vs. Free Speech Context

In light of what has been said hereinabove, the Court must consider the charges of vagueness and overbreadth. Preliminary to answering these charges we must of course delineate a functional definition of the end—preservation of a fair trial—sought to be achieved by the means—DR–7–107. We must further analyze the nexus between this means and that end. Such will serve to delineate the scope of constitutional protection of speech in this free speech versus fair trial context since in large part the scope of protection will be a function of the reasonableness of the relation between the above means and end. But this is not the sole criteria as the nexus in some instances may be reasonable but nevertheless the means itself may be otherwise unreasonable for encroaching too drastically, even in this context, on sensitive areas of free speech.

## D. Functional Definition of Right to Fair Trial

The Sixth Amendment guarantees the right to an impartial jury in all criminal matters and the Fifth Amendment, applied to the States through the Fourteenth, guarantees that no one shall be deprived of property without due process of law. These Amendments along with interpretive Supreme Court opinions constitute the genesis of what is commonly referred to as the right to a fair trial.

In the abstract, this right is easy enough to define—that which comports with procedural and substantive due process; or more specifically, with reference to the issue herein—a verdict based solely upon evidence admissible and admitted in a court of

---

11. Reardon Report at pp. 1, 2, 80–82. (Tentative Draft 1966).

law. As applied in the real world, however, this intangible right is an inherently imprecise one. The imprecision is aggravated in the context of the larger, encompassing right to the fair and orderly administration of justice and the appearance thereof in the eyes of the public. No matter how free from prejudice trials may be, if, through application of rules such as DR 7-107, the public loses faith in and respect for the judicial system as an institution wherein all criminal and civil matters are resolved in an impartial and orderly fashion then actions taken to ward off out-of-court prejudice will have caused far greater harm than untrammeled access to the press would cause.

DR 7-107 appears to be directed towards preserving the right to a fair trial in the more narrow sense as the concept relates to a particular case and not in the broader institutional sense of the fair and orderly administration of justice. But even in this narrower context, in order to know for sure when there was prejudice in a particular case we would have to pry into the minds of the jury or judge which, needless to say, is impossible.

■ Realizing this impossibility, the Courts, perhaps fortuitously, have provided us with a functional definition of the right to a fair trial by judicially determining what would be sufficient to obtain a new trial on the ground of prejudice. They have abandoned the impossible task of requiring proof of actual prejudice for the more realistic query of whether or not there is a reasonable likelihood or probability of prejudice. *See Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 542–

543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Wansley v. Slayton,* 487 F.2d 90, 92–93 (4th Cir. 1973).[12]

Thus, we have a functional definition of the right to a fair trial—the right to have a trial free from a reasonable likelihood or probability of prejudice.

This definition is a necessary starting point but does not without more tell us the extent of constitutional protection of this fair trial right in the conflict area. If the functional definition and the extent of constitutional protection herein were synonymous then any conduct by anybody reasonably likely to prejudice pending litigation would be proscribed. This is obviously not required. If it were, all juries would have to be sequestered and there would be a rule comparable to DR 7-107 governing the news media. The protection obviously does not extend that far. *See Nebraska Press Assn. v. Stuart,* —— U.S. ——, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).[13] Rather, the scope of the constitutional protection of the fair trial right in the conflict area encompasses protection against, and hence prohibition of, any conduct reasonably likely to prejudice a fair trial which, *on balance,* is not protected by free speech (or for that matter, any other constitutionally protected right). The balance, of necessity, must be undertaken with regard to the specific rule in question. As Holmes said in *McCarter* "the boundary at which the conflicting interests balance cannot be determined by any general formula in advance." 209 U.S. at 355, 28 S.Ct. at 531. But before dissecting DR 7-107 we can apply the balancing process to the restrictions that apply to the rule as a whole.

**12.** Although these cases, for the most part, involve criminal jury trials Sheppard implies that this functional definition should apply to civil cases as well. Logically, there is no reason why it should not:

Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice. But it must not be allowed to divert the trial from the "very purpose of a court system . . . to adjudicate contro-

versies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." [Citations Omitted] *Sheppard v. Maxwell,* 384 U.S. 333, 350, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966).

**13.** It should be noted that continuances and new trials are mere palliatives, not protective measures, and in no way insure against the occurrence, no less the repetition, of the infringment.

## V

## CHARGES AS APPLIED TO RULE AS A WHOLE

### A. Rule Applies Exclusively to Lawyers

■ First, and quite significantly, DR 7–107 applies exclusively to lawyers involved in pending litigation. Plaintiff alleges that lawyers enjoy first class citizenship and should not be subject to any special restrictions. Although this rings of an equal protection claim it comes within the charge of overbreadth in the broad sense that it alleges restriction of constitutionally protected speech of lawyers. Plaintiff also charges that it is too drastic a means to achieve the end of a fair trial.

### 1. Least Drastic Effective Alternative

On the contrary the Court sees this as the least drastic, effective alternative. The alternatives of change of venue or a continuance are after the fact palliatives that raise the additional constitutional problems of "vicinage"[14] and "speedy trial."[15] The arguably effective alternative of sequestration of jurors drastically subordinates their individual rights to associate, to speak, to work and to enjoy the manifold liberties secured to them by the Constitution to the important but relatively insubstantial right of lawyers to comment on pending litigation.[16] Muting the press, whose function it is to inform the public, instead of lawyers, whose duty it is to represent a client, is no doubt a more drastic, though perhaps more effective, alternative.

Plaintiff also argues that the restricting of extrajudicial comments by attorneys is too drastic because of the vital role they play in discussing cases outside the courtroom. He states correctly that our theory of government is staked very largely on the premise of an informed and widespread public discussion of important issues. He further states that it is precisely during the pendency of a case involving significant

issues that public discussion is most important and would naturally be at its height. Yet this is precisely when the interests of the party litigants are most likely to be overshadowed by a public appeal and when the outside pressure, not necessarily by design, would come to bear most forcefully in penetrating the courtroom walls. At this point more than any other, anything that counsel might say that would be reasonably likely to influence the trier of fact or of law should be said in the courtroom where its admissability and credibility will be properly tested and where its efficacy will be directly brought to bear on the decision maker.

In *Chicago Counsel of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975), relied upon heavily by plaintiff in all aspects of this case, the Court stated that there are areas in which legitimate reasons exist for attorneys to comment about a case during its pendency, presumably, without regard to the potential for prejudice. With respect to criminal cases, says the Court, it is most important for counsel to be permitted to comment about the unconstitutionality and injustice of the statute or rule involved. With respect to civil trials the Court states that ". . . important social issues [become] entangled to some degree in civil litigation. . . . [and that] the lawyer . . . may be the only articulate voice for that side of the case. Therefore, we should be extremely skeptical about any rule that silences that voice." 522 F.2d at p. 258.

As to the constitutionality of a criminal statute, a lawyer is, or at least should be, more informed than the general public. Obviously however, the proper place for counsel to advocate his informed opinion is in the courtroom on behalf of his client and not before the public at large. After all, it is the prerogative of the Court to interpret the Constitution. Questions of constitutionality *at a trial* are not social or political but

---

**14.** U.S.Const. Amend. 6.

**15.** *Id.*

**16.** Cole, Spals, *Defense Counsel and the First Amendment; A Time to Keep Silent and a Time to Speak*, 6 St. Mary's Law Journal, 347 at 378 note 163.

judicial questions. Such is the limited but vital brake against the tyranny of the majority that was provided by our founding fathers. Within the broad limits of the Constitution the power is the people's and their input into our legislative processes is essential. But neither the Constitution nor the trial of constitutional issues should sway in the winds of public opinion.

On the other hand, the injustice of a criminal statute is an issue that falls squarely within the public concern. Justice in the end is a question of morality, not legality, and is a proper subject among philosophers, the clergy, politicians, lawyers and any citizen. But it is not a proper subject for jurors or judges either inside or outside the courtroom when related to pending litigation. Whether "justice" is served by an otherwise valid law is no defense to a violation of that law and such argument could well constitute reversible error because of its prejudicial effect.[17] A lawyer's comments on questions of morality cannot realistically be said to be so vital that they cannot await the end of a case wherein what he says may well be the source of prejudice.

As for the lawyer's voice being the only articulate one concerning significant civil issues, we need only draw on human experience to know that this is rarely, if ever, the case—though the trial lawyer may easily lead himself to believe in his superior articulateness. Further, the lawyer's voice is not permanently muted nor is it completely muted during the pendency of the case. Such limited deprivation does not outweigh the benefit to the party litigants of protection against the reasonable likelihood of prejudice.

### 2. Special Position of Lawyers

Plaintiff argues further that regardless of whether counsel in pending litigation has something special to add to the public discussion process, the Constitution protects them from being singled out for special restrictions. Contrary to plaintiff's contention, DR–7–107 merely creates a traditionally sanctioned limitation as to the time, place, and circumstances of speech, made necessary here by the peculiar ability of counsel to prejudice litigation through extrajudicial statements during the pendency of a case. One's status as a lawyer is nothing more than an additional circumstance which renders his public statements about a pending case particularly capable of prejudice.

Moreover, lawyers, like the very rich, are not as other men. More can be required of them than of others. They are not, when representing clients in litigation, ordinary citizens—they are extraordinary citizens.[18] Being admitted as part of the awesome system of justice, more is expected and more can be required of them than from a citizen not so entrusted.[19] From those to whom much is given, much may be required.

A majority of the Supreme Court expressed this sentiment in *Sheppard v. Maxwell*, wherein the Court stated that attorney's extrajudicial comments are "not only subject to regulation, but . . . [are] highly censorable and worthy of discipli-

---

17. *Toone v. State*, 144 Tex.Cr. 98, 161 S.W.2d 90 (1942);

> "No party has a right to bring before the jury a matter either of law or of fact for the purpose of causing them to rebel against the law and refuse to follow it and, consequently, the second conceivable purpose will not be recognized."

18. There have been several recent cases where the State has been able to restrict First Amendment rights to freedom of speech and liberty of certain specified classifications of persons. Included among these cases are: *Kelley v. Johnson*, 425 U.S. 1440, 96 S.Ct. 1440, 47 L.Ed.2d

708 (1976); *Broadnick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

19. This conclusion is reinforced by the Supreme Court's recent decision styled *Nebraska Press Assn. v. Stuart*, 424 U.S. 906, 96 S.Ct. 2791, 49 L.Ed.2d 603 (1976) which all but eliminates direct restrictions against the press in the interest of a fair trial and suggests limitation of what "contending lawyers . . . may say to anyone" as a less restrictive alternative.

nary measures." 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

In sum, the fact that DR 7–107 restricts the speech of lawyers, and lawyers exclusively, we find on balance does not render the rule unconstitutional on the ground of overbreadth, free speech, equal protection or otherwise. Keying on lawyers is a reasonable means reasonably related to the end of preserving a fair trial in the least drastic way without compromising sensitive areas of free speech.

### B. REASONABLY–LIKELY–TO–INTERFERE–WITH–FAIR–TRIAL TEST

■ The next general area of concern expressed by plaintiff is the reasonably-likely-to-interfere-with-a-fair-trial test. According to plaintiff, this test is unclear, imprecise, untailored, and too drastic.

#### 1. Reasonably Clear and Precise

The allegations concerning the clarity and precision of the test will be dealt with together as they both incorporate the notions of fair notice or warning of what the rule commands or forbids.

Plaintiff quotes two Supreme Court cases which sum up his position on this issue. In *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939) the Court states that "no one may be required at peril of life, liberty or property to *speculate* as to the meaning of penal statutes" [Emphasis added.] In *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) the Court says that a criminal statute will be found unconstitutional if its *uncertain* boundaries leave open the possibility of punishment for protected conduct and thus lead citizens to avoid such protected activity in order to steer clear of uncertain proscriptions.

Thus, the question boils down to—is the reasonable likelihood test, all things considered, speculative or uncertain?

In *United States Civil Service Commission. v. National Association of Letter Carriers*, 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973) the Supreme Court has indicated that prohibitions on conduct are sufficient constitutionally as long as they can be understood and complied with by "the ordinary person exercising ordinary common sense." Since DR 7–107 applies exclusively to lawyers involved in pending litigation, if it can be understood by the ordinary lawyer exercising ordinary lawyer-like sense then it should be found to be sufficient constitutionally.

Every client represented by a lawyer in a Court of law has a right to assume that the lawyer is expert in trial practice and procedure. If he is not, he has no business in the courtroom and assumes the risk of mistakes due to his incompetency. The phrase, "reasonably likely to interfere with a fair trial," arguably vague to the layman, or perhaps even the tax lawyer who doesn't try cases, should pose no hardship of understanding to a lawyer who considers himself competent to litigate. Can an attorney who considers himself competent enough to try a case claim ignorance as to what comments are reasonably likely to prejudice that case? The answer has to be no. The use and meaning of the word "reasonable" is as familiar to a lawyer as is the meaning of the word "faith" to a priest. Both are difficult to define but a lawyer knows what reasonable means just as a priest knows what faith means. The whole law of torts, for instance, is built around the concept of reasonableness. A fair trial and what may reasonably be expected to prejudice it is something every trial lawyer should know.

Because the test covers a variety of conduct its boundaries cannot be calculated with mathematical precision and there will be doubts raised as to which side of the line specific conduct falls on. But having doubts with regard to borderline conduct is a far cry from dealing in uncertainty and speculation.

#### 2. Reasonable Means of Carrying Out Various Purposes of Rule

■ Plaintiff argues that since there are obvious differences between criminal and civil, between juvenile and administrative,

and between jury and bench trials, the test, even assuming *arguendo* it should apply to criminal jury trials, should not apply across the board as it was not formulated with this intent and could not possibly take into account the substantially differing exigencies of these various types of trials.

Again we disagree. Just as plaintiff so clearly pointed out the obvious differences between the various types of trials so also he must be able to recognize the obvious flexibility in the reasonable likelihood test allowing for variable applications depending upon the type of trial involved.

For example, the reasonable likelihood rule need not be changed or a different word formula used to effect a substantial change in the application of the rule from a criminal jury trial to a civil bench trial. This is so because the likelihood of interference with a fair trial in a bench case is substantially lessened. Hence, the freedom to speak is substantially increased—but not beyond the point where speech would be reasonably likely to interfere with a fair trial. Thus, though the standard is the same in all cases the application may, and does, differ from case to case.

The same relationship holds true for juvenile or administrative hearings. Speech which is reasonably likely to prejudice a murder trial with racial, sexual, political and social overtones would not be reasonably likely to interfere with an administrative hearing concerning whether a claimant is entitled to disability benefit insurance on account of his bad back. The standard is the same. The application differs.

### 3. Reasonably Tailored

■ Plaintiff further alleges that the reasonably-likely-to-interfere-with-a-fair-trial test is unconstitutional because it is not narrowly tailored to the end sought to be protected.

We have already mentioned that the right to a fair trial, functionally defined, is the right to be free from that which is reasonably likely to interfere with a fair trial. Thus, the test in question precisely mirrors the constitutional right sought to be protected. The tailoring could not logically be more narrow and still protect against violation of the right to a fair trial as it has been defined by our courts.

### 4. Cases Applying Serious and Imminent Threat Test Distinguishable

Logic notwithstanding, plaintiff argues that the law is on his side and cites a number of cases to support the position that extrajudicial comments about pending cases can be limited only if they involve a "serious and imminent threat" or a "clear and present danger" to the administration of justice. *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); *Pennekamp v. Florida*, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); *Bridges v. California*, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). *Cf. Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975); *In Re Oliver*, 452 F.2d 111 (7th Cir. 1971); *Chase v. Robson*, 435 F.2d 1059 (7th Cir. 1970).

All of the above cited Supreme Court cases from *Bridges* to *Wood* involved contempt proceedings. The Supreme Court in *Craig* cautioned against reading the law laid down in these contempt cases beyond the limited nature of the problem addressed:

> Neither those cases [Bridges and Pennekamp] nor the present one raises questions concerning the full reach of the power of the state to protect the administration of justice by its courts. *Craig v. Harney, supra* 331 U.S. at 373, 67·S.Ct. at 1253.

The problem addressed in the instant case, although generally related, is substantially different in many respects from that of these contempt cases. The most important distinction is that between the scope of persons and speech subject to the charge of contempt and the scope of persons and speech subject to restriction under DR 7–107. Any speech, in or out of court, uttered by any person affecting "the fair and order-

ly administration of justice" [20] in a pending case is the subject of contempt. Whereas only extrajudicial comments uttered by counsel affecting the litigants' rights to a fair trial comes under DR 7–107. The difference between the coverage is vast. The reach under contempt as to person and place is far greater than that of DR 7–107. But more striking and more important is the difference between the broad and vague scope of speech covered by the language "fair and orderly administration of justice" and the relatively narrow and clear scope of speech covered by the phrase "fair trial." The former includes comments prejudicing any of the parties to a trial but encompasses much more. Notwithstanding its affect upon the parties at trial, any comment that affronts the dignity of the Court, obstructs justice or otherwise impinges upon the fair and orderly administration of justice may be grounds for a contempt citation.[21]

Hence, assuming the clear and present danger test is viable for determining when certain speech will result in the speaker being summarily punished in a contempt proceeding for interfering with the fair and orderly administration of justice in a pending case, such has absolutely no bearing herein; the considerations are immeasurably different and the results of balancing those differing considerations must likewise be different. Suffice it to say that what is and what is not constitutional in the context herein is a product of balancing the competing constitutional interests of fair trial (as functionally defined) and free speech in light of the effect of DR 7–107 upon these respective rights. This involves a complex of considerations and framework of analysis peculiar to this undertaking as we have gone to some length to illustrate.

The remaining cases cited by plaintiff are all from the 7th Circuit written by the same judge, and only one, the *Chicago Council of Lawyers* case, deals with DR 7–107. Curiously, the Court in that case states the following:

We are not as sanguine as plaintiffs that there is no competition or conflict between the right of lawyers to free speech and the right of litigants to fair trials. If by noncompetition they mean that from an ideal or abstract view the two rights can and should coexist without disharmony, we might agree; however, pragmatically, in everyday situations there are bound to be conflicts. Consequently, when irreconcilable conflicts do arise, the right to a fair trial, guaranteed by the Sixth Amendment to criminal defendants and to all persons by the Due Process Clause of the Fourteenth Amendment, must take precedence over the right to make comments about pending litigation by lawyers who are associated with that litigation *if such comments are apt to seriously threaten the integrity of the judicial process.* We do not understand the plaintiffs to take a contrary position. That courts have the duty to ensure fair trials—"the most fundamental of all freedoms"—is beyond question. The Supreme Court made this clear in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Moreover, the Court in that case settled the corollary proposition that courts have the power to "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." [Footnote omitted]. [Emphasis added] 522 F.2d at 248.

We are in complete agreement that the right to make comments about pending litigation by lawyers may be restricted if such comments "are *apt to* seriously threaten the integrity of the judicial process." The difference in meaning between "apt" and "reasonably likely" is not discernible. As has been demonstrated, the reasonably-likely-to-interfere-with-a-fair-trial test does precisely what the Seventh Circuit requires by its test and no more.

The 7th Circuit does not agree:

[W]e are of the view that the rubric used in the rules under consideration, that law-

---

**20.** *E. g. Bridges v. California*, 314 U.S. 252, 259, 62 S.Ct. 190, 192, 86 L.Ed. 192 (1941).

**21.** *E. g. Bridges v. California*, 314 U.S. 252, 259, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

yers' comments about pending or imminent litigation must be proscribed *"if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice"* [Rule 1.07, Local Criminal Rules of the Northern District of Illinois] is overbroad and therefore does not meet constitutional standards. Instead, we think a narrower and more restrictive standard, the one formulated in *Chase v. Robson,* 435 F.2d 1059, 1061–62 (7th Cir. 1970), and reaffirmed in *In re Oliver,* 452 F.2d 111 (7th Cir. 1971), should apply: Only those comments that pose a *"serious and imminent threat"* of *interference with the fair administration of justice* can be constitutionally proscribed. Given the objectives of clearness, precision, and narrowness we are of the view that this formulation is more in keeping with the precepts announced by the Supreme Court to which we have alluded than the one used by the local rules of the district court. A lawyer is put on stricter notice if he must gage his intended comments by a test that limits only comments which are a *serious* and *imminent threat of interference with a fair trial* than if his statements were governed by the more amorphous phrase: "a reasonable likelihood that such comment will interfere with a fair trial." [Emphasis added]. 522 F.2d at 249.

The Court in *Bauer* had before it not only DR 7–107 but also Rule 1.07 of the Local District Criminal Rules which, in addition to the "fair trial" language, includes the above quoted phrase "otherwise prejudice the due administration of justice." In establishing what it perceived to be a constitutionally permissible test for both of these Rules that Court chose not to distinguish between "fair administration of justice" and "fair trial."

As evidenced by the foregoing distinction made between the actions which may be the subject of contempt and actions which are the subject of DR 7–107, "fair administration of justice" and "fair trial" are distinct, albeit related, concepts. The former is much broader and includes the latter but encompasses much more.

Although not before us, this Court can appreciate the use of the serious and imminent threat language as a constitutional standard for restricting speech in furtherance of such a broad based and, to use the 7th Circuit's language, amorphous concept as the fair administration of justice. However, as the scope of the right becomes more particularized, the area of speech affected in securing such right is likewise narrowed. The right to a fair trial is a particular aspect of the larger right to the fair administration of justice and naturally furtherance of the right to a fair trial affects a narrower area of speech than does furtherance of the larger right. Within this narrowed area of speech a higher standard can and should be applied if necessary fully to protect the particular aspect of the right in question if consistent with the standards applied to the larger right. We find that such is the case herein.

Assuming, as we have, that the phrase "serious and imminent threat to a fair trial" connotes the allowance of a larger area of permissible speech than the phrase "reasonably likely to interfere with a fair trial" then, as heretofore evidenced, the former phrase does not adequately protect the right to a fair trial as functionally defined. The reasonable likelihood standard is necessary fully to protect the right in question.

As for consistency with the larger right, most vital to the fair administration of justice is the assurance that parties litigant receive a fair trial. This assurance is a responsibility shared by counsel pursuant to the fiduciary duty they assume as officers of the Court. This duty extends not only to their clients but to the public who have entrusted to lawyers and judges alike maintenance of a fair system of justice. At the very least this duty requires that counsel do not do or say anything that would jeopardize a fair trial. *See* note 18 *supra* and accompanying text.

Hence, we find that extrajudicial comments by counsel (in particular—in light of their fiduciary responsibility) which are rea-

sonably likely to interfere with a fair trial (thus abridging this right as functionally defined) strike at the very core of the fair administration of justice and accordingly pose a serious and imminent threat thereto. In other words the reasonably likely language of DR 7–107 is necessary fully to protect the right to a fair trial and is consistent with the stricter standards applied in the aforementioned contempt cases and in *Bauer* with respect to Rule 1.07.

The dissenting opinion in *Chicago Council of Lawyers* suggests a hybrid test—"comment which, if publicly disseminated, would produce a 'reasonable likelihood' of serious and imminent interference with or prejudice to a fair trial or the due administration of justice is subject to proscription." The major problem with this test, as with the one suggested by the majority, is that it does not fully protect the right to a fair trial as functionally defined. Reversals and new trials are not based on serious and imminent threats of prejudice but rather on a reasonable likelihood thereof. Moreover, prejudice is not amenable to discussion in terms of degree as the dissent attempts. The reasonable likelihood of *any* prejudice is itself a substantial evil as it is impossible to tell which straw of prejudice may break the camel's back. Finally, on a practical level, we must add that the "reasonably likely" language provides counsel with a more familiar and workable guideline than the phrase chosen by the Seventh Circuit.

### 5. Not Too Drastic

■ Separate from the arguments above, the Court must consider whether or not the reasonable likelihood test is too drastic, even though necessary to fully protect the right to a fair trial, on the ground that it encroaches too far on sensitive areas of speech.

In consideration of what has been said hereinabove and that the reasonable likelihood test as used in DR 7–107 has at least implicit approval of the United States Supreme Court and has been chosen with specific regard to DR 7–107 by the Reardon Committee, the ABA, the Virginia State Bar and the Supreme Court of Virginia, we think it would be the height of folly for this Court to determine that the test was constitutionally infirm as being too drastic.

In sum, we find on balance that the reasonable-likelihood-to-interfere-with-a-fair-trial test is a reasonable means to achieve a constitutionally mandated end and does not suffer from the constitutional infirmities of vagueness and overbreadth.

### C. PRIOR RESTRAINT

Plaintiff makes two additional general allegations with regard to DR 7–107: (1) that it constitutes an unconstitutional prior restraint and (2) that the very existence of a regulation restricting speech in the interest of a fair trial that applies to all lawyers in all cases is *per se* unconstitutionally overbroad regardless of its content.

■ With respect to the prior restraint allegation, we give it no weight in our balancing process since the allegation is without merit. An unconstitutional prior restraint is one that cannot be the subject of litigation. DR 7–107 may be contested and thus is not a prior restraint. *See Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir. 1975).

### D. GENERAL REGULATION RESTRICTING COUNSEL'S SPEECH IS NOT *PER SE* UNCONSTITUTIONAL

■ The allegation that restriction of extrajudicial comments by counsel pursuant to a general regulation is *per se* unconstitutional is also without merit. Plaintiff represents that in the vast majority of all cases tried the general proscriptions contained in DR 7–107 are of no practical significance because most cases entail matters and involve parties in which the public has virtually no interest. Without such a popular interest, says plaintiff, the statements of counsel associated with the case would have no effect on the trial and therefore a general rule covering all cases has no legitimate purpose. Plaintiff proposes that in the relatively minute number of cases which gen-

erate public awareness or substantially affect the public interest any potentially prejudicial statements could be anticipated by the trial court and dealt with by an appropriate gag order. Entering such orders where necessary on a case by case basis, according to plaintiff, would allow the trial judge to tailor the proscriptions to the particular exigencies of the case at bar thus providing a less drastic, more realistic and equally efficient method of preserving the interest of a fair trial.

We perceive a number of shortcomings in plaintiff's contentions. First, in order to tailor a gag order on a case by case basis with a reasonable degree of specificity the trial judge would have to anticipate a myriad of specific classes of comments that counsel might state in public and then determine which of those classes would and which would not breed prejudice. The problem of course is that the trial judge would inevitably fail to include certain classes of comments that should have been included thus precluding the deterrent affect of the gag order as to these classes and unduly increasing the potential for prejudice.

After the trial judge attempts to perform this unlikely task he still has to apply a more general standard (whether it be "reasonable likelihood" or some other test) to determine which among the comments he anticipates counsel might state in public contain sufficient potential for prejudice so as to warrant exclusion. It makes so much more sense to allot the responsibility to counsel, whose comments we are concerned about, to hold what public statements he intends to make up against a general standard to determine whether the potential is too great to go forward, rather than require the trial judge to second guess what counsel is apt to say and to hold these hypothetical public statements up against the same standard.

Limiting the protection of a fair trial to specific restrictions made on a case by case basis simply would not adequately protect the right to a fair trial. We have already discussed the fact that reversals, new trials and other after-the-fact remedies will not adequately compensate for the trial judge's lack of clairvoyance.

But regardless of whether or not trial judges are capable of fashioning particularized gag orders that would provide adequate protection for the parties litigant in cases likely to breed prejudice, as a minimum protective measure in every case comments by counsel reasonably likely to interfere with a fair trial should be proscribed. Gag orders may or may not serve as an effective supplement to this minimum requirement, but specific rules absent the minimal generalized proscription cannot adequately serve the interest of a fair trial.

But plaintiff argues in effect that the above analysis is academic because no rule of any sort is needed in the vast majority of cases and it is unconstitutionally burdensome to straddle counsel with any general speech restrictions pursuant to preservation of a fair trial in light of the de minimis nature of the problem.

We do not agree. Assuming, as plaintiff suggests, that at some trials no amount of public comment by counsel could possibly generate publicity such as to pose a reasonable likelihood of adversely affecting a fair trial, then DR 7–107 by its own wording, as read by defendant Supreme Court of Virginia, (see text, *infra* at 26–27) would impose no restriction whatsoever on counsel's right to make public comment. As we discussed earlier, the wording of DR 7–107 embodies a built-in adaptive mechanism whereby it imposes only so much of a restriction on speech as is necessary to insure the reasonable likelihood of a fair trial—no more and no less.

Finally, though the Court agrees with plaintiff to the extent that most trials in and of themselves embody matter of little or no public significance or social importance, that is not to say that DR 7–107 would be of no importance in insuring the reasonable likelihood of obtaining a fair trial in those instances. While there is no question that a fair trial would be severely jeopardized by the unrestricted commentary of counsel involved in cases whose is-

**1154**

sues are necessarily thrust to the forefront of the public forum, we perceive many other types of litigation which involve issues that are not directly related in socially relevant matters but could, during the course of the trial, be made to seem more consequential then their content justifies. This result could well be brought about by artfully phrased and crusading diatribes of counsel. Whether due to a calculated attempt to generate public pressure in favor of a client's position, or an attempt to gain personal publicity or merely innocent overenthusiasm, the impulse is there and the result, no matter what the motive, may be equally harmful to the interest of a fair trial.

DR 7–107 is the deterrent. It is impossible to measure with any statistical accuracy the efficacy of its deterrent effect in this context since, understandably, no comparative data is available showing the number of cases prejudiced by attorneys before and after the adoption of DR 7–107. However, the numerous experienced and respected professionals and laymen involved in the adoption of DR 7–107 agreed that a general rule as to all types of cases would best serve the interests of a fair trial without unnecessarily curtailing the right to free speech. For the reasons stated hereinabove we defer to the factual soundness of their respective decisions.

## VI

## CHARGES AS APPLIED TO SPECIFIC PROSCRIPTIONS

■ At this point we have dealt with and disposed of the allegations lodged by plaintiff against DR 7–107 as a whole. Now we must turn to what this Court has found to be the more troublesome question concerning the constitutionality of the specific restrictions contained in DR 7–107. Actually, the threshold question we face is indeed whether or not there are specific restrictions. Defendant Supreme Court of Virginia, through counsel, has made affirmations in briefs submitted to this Court that there are no specific restrictions in DR 7–107.

Quoting from page 8 of defendant's Supplemental Brief:

Despite the failure of DR 7–107 to repeat the "reasonably-likely-to-interfere-with-a-fair-trial" test after each type of extrajudicial statement, the language of the rule construed as a whole, the nature of the problem to which the rule was addressed, and the comments of the authors of the rule make it abundantly clear that DR 7–107 was intended to prohibit only those public statements that are reasonably likely to interfere with a fair trial. The test of "reasonable likelihood," therefore, is present and must be read into each section of the rules.

Further quoting from page 13, note 2:

. . . [T]he "proscriptions" in DR 7–107(A), (B), (G)(1)–(4) and (H)(1)–(4) should be read as warnings that the types of statements described in these subsections *ordinarily* carry with them a reasonable likelihood of interference with a fair trial. . . . The specific proscriptions in the various subsections of DR 7–107 easily lend themselves to interpretation as warnings of what areas of speech *might* be found to pose a reasonable likelihood of interference with the particular proceedings with which the subsections deal. [Emphasis in original.]

Again, quoting from page 14:

It is obvious, we suggest, that the authors of DR 7–107 had no intent to prohibit any extrajudicial statement that was not reasonably likely to interfere with the fairness of the particular proceeding. The Court should construe DR 7–107 in accordance with that intent.

Finally, on page 17:

The defendants agree with the position taken by Hirschkop . . . that even if the Court does not read the "reasonable likelihood" standard into DR 7–107(A), (B), (F), (G) and (H), the Court need not find implicit in those provisions conclusive presumptions that the speech proscribed therein is reasonably likely to interfere with a fair trial.

If we are to accept the affirmations of defendant Supreme Court of Virginia then

we necessarily must find that there are no specific restrictions in DR 7–107. Under the construction defendant avers is appropriate to the language of the various subsections of DR 7–107 there is but one general restriction—the restriction against extrajudicial statements by counsel during pending or imminent litigation that are reasonably likely to interfere with any aspect of the fair trial of that cause. All of the seemingly specific proscriptions then would amount to, as defendant acknowledges, mere warnings or guidelines to counsel cautioning that certain types of statements under most circumstances ordinarily breed prejudice. However, these warnings as such would have no substantive weight in the adjudication of an alleged violation of the rule. They would raise no conclusive nor, for that matter, rebuttable presumptions against an alleged violator. The sole question in adjudication of an alleged violation would be whether the particular statement in the context of the particular trial precipitated a reasonable likelihood of prejudice as to any of the parties therein.

Plaintiff, ironically, disagrees with defendant's affirmations. Plaintiff says that the rules cannot realistically be construed in the fashion that defendant contends. He urges that the subsections of DR 7–107 do impose specific restrictions. And that these restrictions are not for the most part limited by the reasonably-likely-to-interfere-with-a-fair-trial language except in the few instances where the particular restriction is expressly modified thereby. Therefore, insists plaintiff, "the lack of a standard for applying the [specific proscriptions] renders the rule so vague as to be unconstitutionally infirm." Plaintiff's Brief in Response to Court Order, at page 5.

If we are to accept plaintiff's construction, we would have the additional concern of whether the specific restrictions are reasonably necessary to serve the interest of a fair trial. *United States v. Crothers*, 456 F.2d 1074 (4th Cir. 1972). If they are not reasonably necessary they would constitute an unwarranted and thus unconstitutional intrusion upon First Amendment rights.

Whether this Court accepts the contentions of defendant or plaintiff it seems to us that the result would be substantially the same, that is, whether we construe the language as mere guidelines or as unconstitutional proscriptions, in either case, such would not be the basis of punitive action against lawyers.

In view of defendant's affirmations and in light of our independent judgment, the only logical, though not literal, reading of DR 7–107 is that the specific restrictions in subsections (A), (B), (G) and (H) provide mere guidelines. We find that the language in question as so read raises no problems of constitutionality. Hence, to reiterate, the only ground upon which to invoke punitive measures under DR 7–107 is that of extrajudicial comments by counsel involved in pending or imminent litigation that are reasonably likely to interfere with the fair trial of that cause—this issue to be answered by examining the nature of the comment in view of the circumstances of that cause.

Nevertheless, we feel constrained to say that the language in question, that of subsections DR 7–107(A), (B), (G) and (H), is ill suited for its purpose and misleading in its attempt to provide guidelines by examples of what comments may be reasonably likely to interfere with a fair trial in certain contexts.

An ordinary reading of the subsections would not lead one to conclude that they set forth mere guidelines. Indeed, the Reardon Report shows that the Committee clearly sought to set forth specific proscriptions:

It is the duty of the lawyer not to release or authorize the release of information or opinion for dissemination by means of public communication, in connection with pending or imminent criminal litigation with which he is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice. Reardon Report, p. 82 (Tentative Draft 1966).

\*     \*     \*     \*     \*     \*

[The above] paragraph . . . states in general terms the duty of the lawyer relating to the release of information . . . . The paragraph is not designed to serve as the basis for the application of sanctions but rather to state the broad principle underlying the *specific restrictions* which follow. Reardon Report, p. 84, 85 (Tentative Draft 1966). (emphasis added)

\* \* \* \* \* \*

(1) the *restrictions* are limited as to time, applying only to pending or imminent criminal litigation and, for the most part, only to the period from arrest or the filing of formal charges to the completion of the trial; (2) the *restrictions* on pretrial statements relate to specific matters whose disclosure poses a significant threat to the fairness of the ultimate trial; (e) the *specific restrictions* are applicable only to those attorneys participating in the investigation, prosecution, or defense of a criminal case; and (4) the recommendations contain several provisions designed to make it clear that certain kinds of statements may properly be made because the need to inform the public outweighs any hazard that the statement may present. Reardon Report, p. 82 (Tentative Draft 1966). (emphasis added)

We read the above quoted annotations as showing conclusively that the Committee intends specific restrictions and not mere guidelines.

The Supreme Court of Virginia has in its brief, clearly and unequivocally adopted a different reading of the subject subsections. That Court's construction is just the opposite of that of the Reardon Committee. Where the Reardon Committee sought to articulate a general guideline enforceable by specific restrictions, the Supreme Court of Virginia construes its Rule as a general rule explained by specific examples intended as mere guidelines. The Supreme Court of Virginia is not bound by the intent of the Reardon Committee quoted above, and the construction put on the language of DR 7–107 by the Supreme Court of Virginia is

consistent with the requirements of the United States Constitution. The construction applied by the Reardon Committee is, most likely, inconsistent with the Constitution.

We find it plausible to read DR 7–107 the way defendant contends. We further find that the intent of those responsible for enactment of the Rule is consistent with this interpretation in that defendant Supreme Court of Virginia, itself, is that responsible party. The Reardon Committee Draft is not on trial here, but rather DR 7–107 of the Code of Professional Responsibility of the Commonwealth of Virginia. Defendant, Supreme Court of Virginia, is in a unique position herein in that it acted in a legislative capacity in adopting that Rule. *See* Va.Code Ann. § 54–48(b) (Repl.Vol. 1974). Defendant is further charged with the continuing responsibility of prescribing and overseeing disciplinary action pursuant to the Rule. *Id.* Therefore, the intent of the Supreme Court of Virginia as expressed in the affirmations quoted in this opinion takes on special importance. Although we are only dealing with the facial constitutionality of DR 7–107, we have no doubt that the Supreme Court of Virginia will oversee the Rule's application consistent with the construction set forth in its brief as above quoted.

The law requires us to construe DR 7–107 so as to uphold its constitutionality if such can be done through a fair construction consistent with the intent of those responsible for its enactment. *See Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Blasecki v. City of Durham,* 456 F.2d 87 (4th Cir. 1972); *United States v. Cassiagnol,* 420 F.2d 868 (4th Cir. 1970); *Grove Press, Inc. v. Evans,* 306 F.Supp. 1084 (E.D.Va.1969).

## VII

### A. DR 7–107(A) APPLIES ONLY TO PROSECUTING ATTORNEYS

A final question is raised which is whether DR 7–107(A) applies its restrictions exclusively to prosecuting attorneys

(thus leaving plaintiff with no standing to question this provision) or whether it applies to defense attorneys as well. In light of what we have already found the answer to this question is unimportant since there are no specific restrictions in DR 7–107(A). So whether or not the warnings are meant for the benefit of prosecuting attorneys alone or for both prosecuting attorneys and defense attorneys is of no constitutional consequence.

Noting the possibility of appeal, however, we accept Defendant's affirmations (Defendants' Supplemental Brief pp. 1–7) that DR 7–107 applies only to prosecuting attorneys. Our reasoning again is based on said affirmations and what we independently perceive to be a logical, albeit not literal, reading of the provisions. Since plaintiff is not nor has been affected by DR 7–107(A) he has no standing to question the constitutionality thereof. See *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

## CONCLUSION

■ Earlier in this opinion we stated that we were not analyzing the First Amendment in a vacuum but in an area of conflict with another perhaps equally fundamental constitutional right. We further stated that resolution of this conflict would necessarily involve giving up a portion of that which would ordinarily be protected under each of these rights but for the conflict. We also stated that determining how much each should give involved a balancing process of all relevant considerations that constitute the substance of these rights. Upon balancing those considerations as we have done we find that DR 7–107 as construed by this Court strikes a reasonable balance between fair trial and free speech. It is far from perfect, but the Constitution does not require perfection.

For these and the foregoing reasons, this Court ADJUDGES and DECLARES DR 7–107, as construed herein, to be a reasonable regulation as to time, manner and place

which accordingly does not suffer from the infirmities of vagueness or overbreadth.

## APPENDIX

The final draft of the Reardon Report was approved by the A.B.A. House of Delegates at its mid-winter meeting in February 1968. It reads as follows:

## PART I. RECOMMENDATIONS RELATING TO THE CONDUCT OF ATTORNEYS IN CRIMINAL CASES.

1.1 Revision of the Canons of Professional Ethics.

It is recommended that the substance of the following standards, relating to public discussion of pending or imminent criminal litigation, be embodied in the Code of Professional Responsibility:

It is the duty of the lawyer not to release or authorize the release of information or opinion for dissemination by any means of public communication, in connection with pending or imminent criminal litigation with which he is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in the investigation shall refrain from making any extrajudicial statement, for dissemination by any means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation.

From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement, for dissemination by

any means of public communication, relating to that matter and concerning:

(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;

(2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

(4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer may announce the identity of the victim if the announcement is not otherwise prohibited by law;

(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

The foregoing shall not be construed to preclude the lawyer during this period, in the proper discharge of his official or professional obligations, from announcing the fact and circumstances of arrest (including time and place of arrest, resistance, pursuit, and use of weapons), the identity of the investigating and arresting officer or agency, and the length of the investigation; from making an announcement, at the time of seizure of any physical evidence other than a confession, admission or statement, which is limited to a description of the evidence seized; from disclosing the nature, substance, or text of the charge, including a brief description of the offense charged; from quoting or referring without comment to public records of the court in the case; from announcing the scheduling or result of any stage in the judicial process; from requesting assistance in obtaining evidence; or from announcing without further comment that the accused denies the charges made against him.

During the trial of any criminal matter, including the period of selection of the jury, no lawyer associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial, for dissemination by any means of public communication, except that the lawyer may quote from or refer without comment to public records of the court in the case.

After the completion of a trial or disposition without trial of any criminal matter, and prior to the imposition of sentence, a lawyer associated with the prosecution or defense shall refrain from making or authorizing any extrajudicial statement for dissemination by any means of public communication if there is a reasonable likelihood that such dissemination will affect the imposition of sentence.

Nothing in this Canon is intended to preclude the formulation or application of more restrictive rules relating to the release of information about juvenile or other offenders, to preclude the holding of hearings or the lawful issuance of reports by legislative, administrative, or investigative bodies, or to preclude any lawyer from replying to charges of misconduct that are publicly made against him.

1.2 Rule of court.

In any jurisdiction in which Canons of Professional Ethics have not been adopted by statute or court rule, it is recommended that the substance of the foregoing section be adopted as a rule of court governing the conduct of attorneys.

1.3 Enforcement.

It is recommended that violation of the standards set forth in section 1.1 shall be grounds for judicial and bar association reprimand or for suspension from practice and, in more serious cases, for disbarment. It is

further recommended that any attorney or bar association be allowed to petition an appropriate court for the institution of disciplinary proceedings, and that the court have discretion to initiate such proceedings, either on the basis of such a petition or on its own motion.

DR 7–107 is substantially the same as that of the final draft of the Reardon Report set out above. However, there are a number of significant omissions and changes. There are also additional areas of coverage that go beyond the scope of the research and analysis of the Reardon Committee. DR 7–107 reads as follows:

DR 7–107 Trial Publicity.

(A) A lawyer participating in or associated with the investigation of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that does more than state without elaboration:

    (1) Information contained in a public record.

    (2) That the investigation is in progress.

    (3) The general scope of the investigation including a description of the offense and, if permitted by law, the identity of the victim.

    (4) A request for assistance in apprehending a suspect or assistance in other matters and the information necessary thereto.

    (5) A warning to the public of any dangers.

(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

    (1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

    (2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

    (3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

    (4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

    (5) The identity, testimony, or credibility of a prospective witness.

    (6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case.

(C) DR 7–107(B) does not preclude a lawyer during such period from announcing:

    (1) The name, age, residence, occupation, and family status of the accused.

    (2) If the accused has not been apprehended, any information necessary to aid in his apprehension or to warn the public of any dangers he may present.

    (3) A request for assistance in obtaining evidence.

    (4) The identity of the victim of the crime.

    (5) The fact, time, and place of arrest, resistance, pursuit, and use of weapons.

    (6) The identity of investigating and arresting officers or agencies and the length of the investigation.

    (7) At the time of seizure, a description of the physical evidence seized, other than a confession, admission, or statement.

    (8) The nature, substance, or text of the charge.

    (9) Quotations from or references to public records of the Court in the case.

(10) The scheduling or result of any step in the judicial proceedings.

(11) That the accused denies the charges made against him.

(D) During the selection of a jury or the trial of a criminal matter, a lawyer or law firm associated with the prosecution or defense of a criminal matter shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to the trial, parties, or issues in the trial or other matters that are reasonably likely to interfere with a fair trial, except that he may quote from or refer without comment to public records of the court in the case.

(E) After the completion of a trial or disposition without trial of a criminal matter and prior to the imposition of sentence, a lawyer or law firm associated with the prosecution or defense shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by public communication and that is reasonably likely to affect the imposition of sentence.

(F) The foregoing provisions of DR 7–107 also apply to professional disciplinary proceedings and juvenile disciplinary proceedings when pertinent and consistent with other law applicable to such proceedings.

(G) A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication and that relates to:

(1) Evidence regarding the occurrence or transaction involved.

(2) The character, credibility, or criminal record of a party, witness, or prospective witness.

(3) The performance or results of any examinations or tests or the refusal or failure of a party to submit to such.

(4) His opinion as to the merits of the claims or defenses of a party, except as required by law or administrative rule.

(5) Any other matter reasonably likely to interfere with a fair trial of the action.

(H) During the pendency of an administrative proceeding, a lawyer or law firm associated therewith shall not make or participate in making a statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication if it is made outside the official course of the proceeding and relates to:

(1) Evidence regarding the occurrence or transaction involved.

(2) The character, credibility, or criminal record of a party, witness, or prospective witness.

(3) Physical evidence or the performance or results of any examinations or tests or the refusal or failure of a party to submit to such.

(4) His opinion as to the merits of the claims, defenses, or positions of an interested person.

(5) Any other matter reasonably likely to interfere with a fair hearing.

(I) The foregoing provisions of DR 7–107 do not preclude a lawyer from replying to charges of misconduct publicly made against him or from participating in the proceedings of legislative, administrative, or other investigative bodies.

(J) A lawyer shall exercise reasonable care to prevent his employees and associates from making an extrajudicial statement that he would be prohibited from making under DR 7–107.