CONSUMERS UNION OF UNITED STATES, INC., et al., Plaintiffs,

v.

AMERICAN BAR ASSOCIATION et al., Defendants.

Civ. A. No. 75–0105–R.

United States District Court,
E. D. Virginia,
Richmond Division.

May 8, 1979.

James W. Benton, Jr., Hill, Tucker & Marsh, Richmond, Va., Peter H. Schuck and Marsha N. Cohen, Washington, D. C., for plaintiffs.

Stuart H. Dunn, Deputy Atty. Gen., and John F. Rick, Richmond, Va., for all defendants except ABA.

H. Merril Pasco, Richmond, Va., Robt. D. McLean, H. Blair White, Sidley & Austin, Chicago, Ill., for defendant ABA.

Before BRYAN, Circuit Judge, and MERHIGE and WARRINER, District Judges.

MERHIGE, District Judge.

This matter comes before this 28 U.S.C. § 2281 three judge district court on remand from the United States Supreme Court for "further consideration in light of *Bates v. State Bar of Arizona* [433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810]." *Consumers Union of the United States, Inc. v. Virginia State Bar,* 433 U.S. 917, 97 S.Ct. 2993, 53 L.Ed.2d 1104 (1977). In its order, the Supreme Court vacated this court's prior judgment, reported at 427 F.Supp. 506 (E.D.Va.1976).

The facts of the instant case were stated at length in *Consumers Union of United States, Inc. v. American Bar Association,* 427 F.Supp. 506, 508–512 (E.D.Va.1976), and shall, therefore, be recounted now only briefly. Plaintiffs, Consumers Union of United States, Inc. (hereinafter "Consumers Union") and Virginia Citizens Consumer Council (hereinafter "Consumers Council"), are non-profit consumer organizations which have brought this 42 U.S.C. § 1983 action seeking declaratory and injunctive relief, and reimbursement from defendants for their costs and attorney fees incurred in prosecuting this action.

Defendants, Virginia State Bar (hereinafter "State Bar"), the Supreme Court of Virginia, Howard W. Dobbins, Rothwell J. Lillard and the Honorable Lawrence W. I'Anson, were all responsible, in varying degrees, for the adoption, interpretation, and/or enforcement of the Code of Professional Responsibility of the Virginia State Bar.[1]

In 1974, plaintiff Consumers Union, through questionnaires, sought to elicit certain information from all Arlington County, Virginia attorneys who were licensed to practice law in Virginia; Consumers Union planned to use the information it received in publication of a directory that was intended to help consumers select and evaluate Arlington County attorneys. Much of the information which Consumers Union solicited and planned to publish in the directory, however, was data which, if disseminated to the public, would violate certain Vir-

---

1. Plaintiffs also brought suit against the American Bar Association (hereinafter "ABA"). This Court, in its December 17, 1976 opinion and order, dismissed the ABA as a party defendant. After the Supreme Court vacated this Court's opinion and order, and remanded the case for reconsideration in light of *Bates v. State Bar of Arizona*, this Court entered an order, filed August 17, 1978 with the agreement of Consumers Union and the state defendants, again dismissing the ABA for the reasons set forth in the prior opinion.

ginia Code of Professional Responsibility (hereinafter "State Bar Code") Disciplinary Rule 2–102(A)(6) prohibitions on lawyer advertising.

Plaintiffs, recognizing that few, if any, Arlington County attorneys would risk professional disciplinary sanctions by sending information for use in a publication which would violate State Bar Code rules, ". . . seek a declaration that the defendants have violated the First and Fourteenth Amendment rights of the plaintiffs and their members to gather, publish and receive factual information in reference to attorneys practicing in Arlington County, Virginia, and seek additionally an injunction permanently enjoining the enforcement and operation of [State Bar Code Disciplinary Rule 2–102(A)(6)]. . . . Jurisdiction over the action is premised on 28 U.S.C. § 1343(3)." *Consumers Union, supra*, 427 F.Supp. at 508.

*First Amendment Claims:*

In this Court's previous, now vacated opinion, the majority held that both the non-fee information[2] and the information on attorneys' initial consultation fees which plaintiffs sought to include in their directory was commercial speech protected by the First Amendment, and made applicable to the states through the Fourteenth Amendment. This Court found that State Bar Code Disciplinary Rule 2–102(A)(6) (hereinafter "State Bar Code DR2–102(A)(6)" or "DR2–102(A)(6)") was overbroad and unconstitutionally infringed upon plaintiffs' rights to receive and gather consumer information. The Court therefore permanently enjoined defendants from enforcing the State Bar Rules and Regulations

against publishing such information. *Consumers Union, supra*, 427 F.Supp. at 523.

*Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), reinforces our prior opinion as to the unconstitutionality of the State Bar Rules' prohibition against publication of both the non-fee information and attorneys' initial consultation fees information at issue in this case. The Court therefore reinstates and reissues its original opinion and order as to these issues. *See Consumers Union, supra*, 427 F.Supp. at 517–523.

■ Furthermore, in light of *Bates*, this Court holds that plaintiffs are entitled to gather and publish, and their members are entitled to receive, truthful information as to the fees at which the listed lawyers will perform the routine legal services enumerated in plaintiffs' questionnaire.[3]

The heart of the dispute before us today is whether lawyers may constitutionally advertise the *prices* at which certain routine services will be performed . . whether the State may prevent the publication in the newspaper of appellants' truthful advertisement concerning the availability and terms of routine legal services. We rule simply that the flow of such information may not be restrained . . . .

*Bates, supra*, 433 U.S. at 367–68, 384, 97 S.Ct. at 2701-2709. (Emphasis in original).

*Attorneys Fees:*

Plaintiffs have asked this Court to grant them reasonable counsel fees, as well as their costs in prosecuting this action. Defendants have not opposed plaintiffs' motion that defendants be ordered to pay costs.[4] Indeed, it is well established that a

---

**2.** The non-fee information which plaintiffs seek to include in their directory is the attorney's background, education, legal activities, affiliations, law firm, nature of practice, substantive areas of practice, office hours, knowledge of foreign languages, billing and credit arrangements, and handling of client complaints.

**3.** The questionnaire asks ". . . information on the average fee charged for a number of common legal services, such as change of name, individual bankruptcy, representation of the complainant in an uncontested divorce, and

closing and settlement on the sale of a single-family house." *Consumers Union of United States, Inc. v. American Bar Association*, 427 F.Supp. 506, 511 (E.D.Va.1976).

**4.** ". . . [D]efendants . . . for their response to plaintiffs' motion for an order declaring defendants' liability for fees and costs, say that an award of attorneys fees should be denied for the reasons stated in the attached brief". Defendants' "Response To Motion For an Order Declaring Defendants' Liability For Fees and Costs."

federal court may tax costs against state parties to federal law suits, in the same way that it may tax costs against any other federal court litigant. *See e. g.*, Rule 54(d), Federal Rules of Civil Procedure; *Hutto v. Finney*, 437 U.S. 678, 696, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Fairmont Creamery Co. v. Minnesota*, 275 U.S. 70, 77, 48 S.Ct. 97, 72 L.Ed. 168 (1926); *Samuel v. University of Pittsburgh*, 538 F.2d 991, 999 (3rd Cir. 1976).

Defendants do contend, however, that this Court may not, or, in the alternative, should not, allow plaintiffs to recover attorneys fees from defendants. The Civil Rights Attorneys' Fees Awards Act provides that

> . . . In any action or proceeding to enforce a provision of Section . . . 1983 . . . of this Title (42 U.S.C.), . . . the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as *part of the costs.*

42 U.S.C. § 1988 (1976) (emphasis added).

■ Despite the broad language of 42 U.S.C. § 1988, giving this Court discretion in "any action or proceeding" under 42 U.S.C. § 1983, to allow the prevailing party attorneys fees as part of costs, the state defendants assert that the doctrines of sovereign immunity, judicial immunity, and "good faith" immunity preclude awarding attorneys fees against them. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), decided after defendants filed their brief in this case, the Supreme Court held that neither the sovereign immunity nor "good faith" defenses insulate state defendants, when sued in their official capacities, from liability for attorneys fees under 42 U.S.C. § 1988. *See Hutto v. Finney*, at 693–700, 98 S.Ct. 2565.

■ The only remaining issue raised by defendants as to this court's jurisdiction, under 42 U.S.C. § 1988, to order that defendants pay plaintiffs reasonable attorneys fees is whether defendants are protected by judicial immunity from such an award. Defendants I'Anson, Dobbins and Lillard, sued in both their official and their individual capacities, are absolutely immune, in their individual capacities, from personal liability for plaintiffs' attorneys fees. "Awards against the official in his individual capacity, in contrast, were not to be affected by the statute (42 U.S.C. § 1988)". *Hutto v. Finney*, 437 U.S. at 700, 98 S.Ct. at 2579. Defendant I'Anson, as Chief Justice of the Supreme Court of Virginia, is clearly immune, in his individual capacity, from all liability—damages, attorneys fees and other costs—for all of his "judicial acts."

As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself."

*Stump v. Sparkman*, 435 U.S. 349, 355, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978), *quoting Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872).

The record reflects that defendant Supreme Court of Virginia has the jurisdiction to adopt, modify, or refuse to modify the Virginia Code of Professional Responsibility. *See* Virginia Code § 54–48 (1974). Chief Justice I'Anson's actions, as a member of the Supreme Court of Virginia, relating to the Court's failure to amend or repeal DR2–102(A)(6), were clearly judicial acts within the Court's jurisdiction; Chief Justice I'Anson therefore in the instant case enjoys absolute judicial immunity from individual liability for attorneys fees.

Defendants Dobbins and Lillard likewise have absolute immunity, in their individual capacities, for their acts as officers of the State Bar. The State Bar is the state administrative agency through which the Supreme Court of Virginia regulates the practice of law in that state. The State Bar, in recommending rules and rule changes to the Supreme Court of Virginia, and in interpreting those rules for its members, acts both at the direction of the court and as a quasi-judicial body. Its members, in the

exercise of those quasi-judicial functions are immune from personal liability. *See Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *McCray v. Maryland*, 456 F.2d 1 (4th Cir. 1972).

■ Defendants State Bar and Supreme Court of Virginia, as well as defendants Dobbins, Lillard and I'Anson, in their official capacities, however, are not immune from liability for attorneys fees. Both the extensive legislative history of 42 U.S.C. § 1988, as well as the numerous court opinions interpreting the statute clearly indicate that all branches and agencies of state governments may be liable for attorneys fees in 42 U.S.C. § 1983 actions.

The Civil Rights Acts, to be effective, depend heavily upon enforcement by private parties such as the instant plaintiffs.

> . . . fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain. . . . If private citizens are to be able to assert their civil rights, . . . citizens must have the opportunity to recover what it costs them to vindicate these rights in court.

S.Rep.No.94–1011, 94th Cong., 2d Sess. 2 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News pp. 5908, 5910.

In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court recognized that Congress had the power to abolish the common law immunity defenses in actions for damages under 42 U.S.C. § 1983. The Court found, however, that the judicial immunity defense was still viable in 42 U.S.C. § 1983 actions for damages, because the legislative record of 42 U.S.C. § 1983 gave ". . . no clear indication that Congress meant to abolish wholesale all common-law immunities." *Pierson v. Ray*, 386 U.S. at 554, 87 S.Ct. at 1218.

In contradistinction to the silence of the legislative record on common law immunities from damages under 42 U.S.C. § 1983, discussed in *Pierson v. Ray*, the legislative record of 42 U.S.C. § 1988 clearly enunciated Congress's intention to make all common law immunities inapplicable in 42 U.S.C. § 1988 actions for attorney fees.

> . . . *Fee awards are therefore provided in cases covered by S. 2278 (42 U.S.C. § 1988)* in accordance with Congress' powers under, inter alia, the Fourteenth Amendment, Section 5 . . . [D]efendants in these cases are often State or local bodies or state or local officials. In such cases it is intended that the attorneys' fees, like other items of cost, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).

S.Rep.No.94–1011, at 5, U.S.Code Cong. & Admin.News, 1976, at 5913. (Footnotes omitted and emphasis added).

The instant action is one brought under 42 U.S.C. § 1983, a case "covered by" 42 U.S.C. § 1988, and therefore a case in which attorneys fees normally should be awarded to the prevailing plaintiffs. The previously quoted language of the statute itself reinforces this interpretation. "The Act itself could not be broader. It applies to 'any' action brought to enforce certain civil rights laws." *Hutto v. Finney,* 437 U.S. 678, 694, 98 S.Ct. 2565, 2575, 57 L.Ed.2d 522 (1978).

Furthermore, statements in the congressional record specifically reject extending *Pierson v. Ray* judicial immunity from damages to 42 U.S.C. § 1988 actions for attorneys fees.

> . . . [I]n some cases, immunity doctrines and special defenses, available only to public officials, preclude or severely limit the damage remedy [17] [citing *Pierson v. Ray,* 386 U.S. 547 (1967)]. Consequently awarding counsel fees to prevailing plaintiffs in such litigation is particularly important and necessary if Federal civil and constitutional rights are to be adequately protected. To be sure, in a large number of cases . . . only injunctive relief is sought, and prevailing

plaintiffs should ordinarily recover their counsel fees.

H.R.Rep.No.94–1558, 94th Cong., 2d Sess. 9 (1976).

In light of the clear wording of the statute and the extensive legislative history of 42 U.S.C. § 1988, we hold that this Court has the authority to order the state defendants in this case to pay plaintiffs' reasonable attorneys fees. *See also, Alsager v. District Court,* 447 F.Supp. 572 (S.D.Iowa 1977) (attorneys fees awarded under 42 U.S.C. § 1988 against defendants, including the county court and the county court judge); *White v. Crowell,* 434 F.Supp. 1119 (W.D.1977) (*per curiam*) (three judge district court awarded 42 U.S.C. § 1988 attorneys fees against the State of Tennessee for the state legislature's unconstitutional ad hoc partial reapportionment).[5]

Defendants next contend that this Court should exercise its discretion to deny plaintiffs' request for attorneys fees. 42 U.S.C. § 1988 provides that, in any action brought under 42 U.S.C. § 1983, " . . . the Court, in its discretion, *may allow* the prevailing party . . . a reasonable attorney's fee as part of the costs." (Emphasis added).

A court, in exercising its discretion, should ordinarily award reasonable attorneys fees to a prevailing civil rights plaintiff " . . . unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). This standard is applicable in all 42 U.S.C. § 1988 actions for attorneys fees. S.Rep.No.94–1011, at 4, U.S.Code Cong. & Admin.News, 1976, at 5912; H.Rep.No.94–1558, at 6 (1976); *Morrow v. Dillard,* 580 F.2d 1284, 1300 (5th Cir. 1978); *Wharton v. Knefel,* 562 F.2d 550, 557 (8th Cir. 1977).

■ Defendants cite several factors which they contend constitute "special circumstances" which would render unjust an award of attorneys fees to plaintiffs. De-

fendants first assert that a "special circumstance" is the importance of maintaining the independence of the state judiciary to regulate the practice of law. Awarding attorneys fees in this case, so defendants contend, would promote undue timidity in interpreting those regulations.

We find this argument unpersuasive. All state officials and governmental units subject to 42 U.S.C. § 1983 suits are entrusted with safeguarding citizens' constitutional rights. Those, including defendants, who must exercise discretion in performing their legislative, executive or judicial duties are afforded varying degrees of immunity from damage actions, so that they may exercise that discretion without fear of personal consequences. 42 U.S.C. § 1988 did not affect the common law immunities from damages, but provided that such immunities would be inapplicable in 42 U.S.C. § 1988 actions for attorneys fees. H.Rep.No.94–1558, p. 9 (1976), *supra.*

If this Court held that defendants were immune from being required to pay plaintiffs' attorney fees, the result would be that private parties with meritorious civil rights claims against governmental defendants would be prevented by the specter of substantial legal costs from bringing civil rights actions for injunctive relief. This is precisely the impediment to private enforcement of the Civil Rights Acts which Congress, through 42 U.S.C. § 1988, sought to eradicate. "If successful plaintiffs were routinely forced to bear their own attorneys fees, fewer aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." H.Rep.No.94–1558 at 6 (1976), *quoting Newman v. Piggie Park Enterprises, Inc., supra.*

Defendants additionally state that it is merely fortuitous that the instant case was pending at the time the 42 U.S.C. § 1988 attorney fee provision was enacted, as the case was tried five months previous to the

---

5. Just as judges have absolute immunity from damages in § 1983 suits for "judicial acts", so too do legislators have absolute immunity from damages for acts performed within their legislative roles. *Tenney v. Brandhove,* 341 U.S 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

attorneys fee act becoming law. This argument is irrelevant to any discussion of "special circumstances", however, since Congress clearly intended the act "to apply to all cases pending on the date of enactment . . . ." H.Rep.No.94–1558, at 4, n. 6 (1976), *citing Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1976); *Hutto v. Finney,* 437 U.S. 678, 695 n. 23, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Burt v. Abel,* 585 F.2d 613, 617 (4th Cir. 1978).

■ Defendants argument that plaintiffs should not receive attorneys fees because their own staff counsel, and not outside attorneys, prepared the case, is equally without merit. The Civil Rights Acts provide for awards of attorneys fees to prevailing plaintiffs regardless of whether the plaintiffs' organizational counsel prosecuted the action, or whether the plaintiffs were represented by attorneys of a public interest organization. *See Reynolds v. Coomey,* 567 F.2d 1166, 1167 (1st Cir. 1978); *Tillman v. Wheaton-Haven Recreation Association, Inc.,* 517 F.2d 1141, 1147–48 (4th Cir. 1975).

■ Finally, defendants contend that they should not be ordered to pay attorneys fees because plaintiffs accomplished nothing of any public benefit in the instant case. *See, Zarcone v. Perry,* 581 F.2d 1039 (2d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979); *Naprstek v. City of Norwich,* 433 F.Supp. 1369 (N.D. N.Y.1977). Defendants claim that the matters on which plaintiffs have prevailed in the instant case add virtually nothing to the holding in *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

· Defendants' contentions that plaintiffs' suit has resulted in little or no benefit to the public are totally at odds with the facts. Plaintiffs brought this suit because defendant State Bar had ruled that DR2–102(A)(6) made it inappropriate for Virginia lawyers to include their names and information, which this Court has held to be constitutionally protected, in a legal directory. The directory was to be published as a public service to Arlington County area consumers, and was to be sold at its cost of production. As a result of the State Bar's interpretation of DR2–102(A)(6), few, if any, Arlington County lawyers would respond to Consumers Union's questionnaire.

Not only was the public deprived of constitutionally protected information at the time this suit was instituted, but the deprivation continues to this day.

Defendant Supreme Court of Virginia still has not amended the Virginia Code of Professional Responsibility to conform to the requirements of the Constitution as enunciated in *Bates,* and the Consumers Union directory has yet to be published. In December, 1978, a Virginia Beach, Virginia attorney was indicted under two Virginia statutes for publication of an advertisement that was virtually identical to the advertisement which the Supreme Court in *Bates* found constitutionally protected, but which DR2–102(A)(6) still prohibited. The chilling effect of DR2–102(A)(6) on First Amendment freedoms is yet extant, even if not subject to objective calculations.

■ Recognizing, as discussed earlier, that good faith is not a defense to 42 U.S.C. § 1988 liability for attorneys fees, nonetheless special circumstances would make unjust any award of attorneys fees against defendant State Bar or against defendants Dobbins and Lillard in their official capacities as State Bar officers. The Supreme Court of Virginia, and not defendants State Bar, Dobbins or Lillard, has the power to change the State Bar Code disciplinary rules. The record reflects that defendant State Bar and its appropriate officers endeavored to persuade the Supreme Court of Virginia to amend DR2–102(A)(6) to conform to what they deemed to be constitutional guidelines. Defendant Lillard presided over a committee of the Virginia State Bar which recommended to the State Bar council that DR2–102(A)(6) be amended; defendant Dobbins presided over the State Bar council which petitioned the Supreme Court of Virginia to change DR2–102(A)(6). Despite these entreaties, the Supreme Court of Virginia declined to amend DR2–

102(A)(6). Under these particular facts, it would be unjust to require the State Bar defendants to pay plaintiffs' attorneys fees. *See Chastang v. Flynn and Emrich Co.*, 541 F.2d 1040, 1045 (4th Cir. 1976).

■ Similar circumstances, however, are not present to make unjust an award of attorneys fees against the Supreme Court of Virginia in its official capacity, and defendant Chief Justice I'Anson in his official capacity. The Supreme Court of Virginia has yet to amend State Bar Code DR2–102(A)(6) to conform with the clear constitutional requirements of *Bates*—a decision handed down June 29, 1977, more than twenty months ago. Indeed, this district court, in the interest of comity has delayed the instant opinion to the point that any further delay would be, as we view it, dereliction of our responsibilities.

The Supreme Court of Virginia, too, denied defendant State Bar's petition to amend DR2–102(A)(6) to conform with the American Bar Association proposals and the perceived constitutional requirements of *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), a case which set forth certain First Amendment protections for commercial speech. It would hardly be unjust to order the Supreme Court of Virginia defendants to pay plaintiffs reasonable attorneys fees in light of their continued failure and apparent refusal to amend State Code DR2–102(A)(6) to conform with constitutional requirements.

Counsel for the Supreme Court of Virginia defendants and counsel for plaintiffs will be directed to attempt to reach an agreement on a reasonable sum as plaintiffs' attorneys fees, and to submit any such agreement to this Court. In the event the parties fail to reach agreement, this Court shall determine an appropriate sum to which plaintiffs are entitled.

WARRINER, District Judge, dissenting in part and concurring in part.

I agree with the decision of the majority that special circumstances render an award

of attorneys' fees against the Virginia State Bar unjust. I believe, however, that the majority has misapprehended the nature of the immunity enjoyed by defendant Virginia Supreme Court in this matter, and so I respectfully dissent from the award of attorneys' fees against that defendant.

I

Central to the majority's analysis is the proposition that an award of fees is authorized in this case by the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (hereinafter called the Act), because Congress in passing that Act specifically intended to abrogate judicial immunity from awards of attorneys' fees. I do not believe, however, that this question need be reached because it is my view that the immunity enjoyed by the Supreme Court under the facts of this particular case is legislative immunity and not judicial immunity.

Plaintiffs in this action sought a declaratory judgment that certain rules prescribed by the Supreme Court for the governance of the professional conduct of attorneys-at-law were unconstitutional, and for an injunction against the enforcement of those rules. The Supreme Court of Virginia was made a party to this action by virtue of the fact that it "adopted and promulgated the State Bar Code, purporting to act under the authority of § 54–48 of the Virginia Code." Complaint at p. 4. No other cause of action is alleged against the Supreme Court of Virginia. Thus, it is for the act of adopting and promulgating DR2–102(A)(6) that the Supreme Court of Virginia was made a party to this action and for which the majority now holds it liable for attorneys' fees.

In enacting the disciplinary rule challenged in this law suit, the Supreme Court of Virginia acted pursuant to the authority granted to it in Va.Code § 54–48(b) (1978 Repl.)[1] That section specifically empowers

---

1. § 54–48. *Rules and regulations defining practice of law and prescribing procedure for practice by law students, codes of ethics and* *disciplinary procedure.*—The Supreme Court may, from time to time, prescribe, adopt, promulgate and amend rules and regulations:

the Supreme Court to prescribe a code of ethics for attorneys-at-law. This Court has previously indicated that the Supreme Court of Virginia acts in a legislative capacity in adopting disciplinary rules. *Hirschkop v. Va. State Bar*, 421 F.Supp. 1137, 1156 (E.D.Va.1976), *rev'd. on other grounds*, 594 F.2d 356 (4th 1979). This view is readily supported by analysis. Disciplinary rules are rules of general application and are statutory in character. They act not on parties litigant but on all those who practice law in Virginia. They do not arise out of a controversy which must be adjudicated, but instead out of a need to regulate conduct for the protection of all citizens. It is evident that, in enacting disciplinary rules, the Supreme Court of Virginia is constituted a legislature.

I now face the problem of whether the Supreme Court of Virginia, acting in a legislative capacity, enjoys legislative immunity. There is no doubt that it does. In *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, —— U.S. ——, 99 S.Ct. 1171, 59 L.Ed.2d 461 (1979), the Supreme Court held that the appointed members of a governing body of a regional planning agency were entitled to legislative immunity against a suit for damages under 42 U.S.C. § 1983. The Supreme Court in *Lake Country Estates* rejected a narrow, formalistic view of legislative immunity in favor of a view that legislative immunity was to be accorded where the function complained of was a legislative function. The Court said: "[T]o the extent the evidence discloses that these individuals were acting in a capacity comparable to that of members of a state legislature, they are entitled to absolute immunity from federal damage liability." —— U.S. at ——, 99 S.Ct. at 1180.

In so holding, the Supreme Court followed closely the reasoning of *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which teaches that it is the function of the official, and not his title, which controls the nature of his immunity.

In *Butz*, the Supreme Court held that employees of the Executive Branch serving as administrative law judges and hearing examiners for administrative agencies enjoy judicial immunity. The Court reached this conclusion by an analysis of the work of hearing examiners and administrative law judges finding their role was "functionally comparable" to that of a judge. The Supreme Court also held that agency officials performing functions analogous to those of a prosecutor should be able to claim the prosecutorial immunity established by the Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The Court spoke of the functions of such officials being very much like the functions of a prosecutor in a criminal law context.

In *Briggs v. Goodwin*, 186 U.S.App.D.C. 179, 569 F.2d 10 (1977) the question presented was whether a prosecutor was entitled to the absolute immunity accorded him in his quasi-judicial status under *Imbler*, or whether he was merely entitled to the qualified immunity typically conferred on other investigative officers. The court held in *Briggs* that the prosecutor was not entitled to absolute immunity because the act on which the suit was based was not one done in the course of exercising prosecutorial discretion. Thus, the quality of the immunity depended not upon the title of the officer but instead upon the nature of the function being discharged. This distinction was earlier recognized by the Fourth Circuit in *Eslinger v. Thomas*, 476 F.2d 225, 228 (4th Cir. 1973). There a State lieutenant governor was found to be entitled to legislative immunity when he was acting as president of the State senate.

This analysis is, of course, nothing more than a common sense approach to the question of official immunity. These immunities are the creatures of public policy, and depend necessarily upon the function being performed by the official when he does the acts for which he is called upon to answer.

.    .    .    .    .

(b) Prescribing a code of ethics governing the professional conduct of attorneys-at-law including the practice of law or patent law through professional law corporations, professional associations and partnerships, and a code of judicial ethics.

The title of the office in no way determines the scope and character of the privilege enjoyed by the incumbent. Thus, the fact that the Supreme Court of Virginia is comprised entirely of judges does not determine the scope and character of the privilege enjoyed by the Supreme Court when it enacts disciplinary rules. If the function is legislative, then the applicable privilege is the legislative privilege.

## II

To properly understand the scope and nature of legislative immunity one must examine its origin and purpose.

According to Chief Justice Warren, "absolute legislative privilege dates back to at least 1399." *Barr v. Matteo*, 360 U.S. 564, 579, 79 S.Ct. 1335, 1343, 3 L.Ed.2d 1434 (1959) (Warren, C. J., dissenting). During the struggle between Parliament and Crown in the 17th Century the privilege of those engaged in legislating to be free of the fear of arrest or civil process as a result of their legislative activity crystalized. The Bill of Rights which followed the Glorious Revolution of 1688 established the privilege unequivocally. "That the freedom of speech, and debates or proceedings in Parliament ought not to be impeached or questioned in any Court or Place out of Parliament." W. and M. 2, c. 2, (1689).

The tradition of legislative immunity was equally strong in the Colonies. It was embodied in Article V of the Articles of Confederation and Article 1, § 6 of the Federal Constitution. *Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Today, most state constitutions, including that of Virginia, establish this legislative immunity. Va.Const. art. IV, § 9.

*Tenney*, in its explanation for reaffirming state legislative immunity, quotes from the works of James Wilson, an influential member of the committee which was responsible for incorporating legislative immunity into the Federal Constitution.

In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offence. II Works of James Wilson (Andrews ed 1896) 38. *Tenney*, 341 U.S. at 373, 71 S.Ct. at 786.

*Tenney* also quotes with approval an explanation of the privilege expounded by Chief Justice Parsons in *Coffin v. Coffin*, 4 Mass. 1, 27 (1808) in the early 19th century.

These privileges are thus secured, not with the intention of protecting the members against prosecution for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecution, civil or criminal. I therefore think that the Article ought not to be construed strictly, but liberally, that the full design of it may be answered. *Tenney*, 341 U.S. at 373–74, 71 S.Ct. at 787.

This understanding that the broad application of legislative immunity is central to the proper functioning of representative government is one that arose in the midst of ancient parliamentary struggles and has been unquestioned in this country since the Revolution. It is a privilege which inures to the benefit of all of us. Legislative functions not free from the specter of judicial penalty and sanction cannot truly represent the wishes of the people. As noted by Justice Frankfurter, "[o]ne must not expect uncommon courage even in legislators." *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788. Legislators, being human, would be inhibited by the specter of penalty and sanction. It is to free the people's representatives [2] from such inhibiting effect that the privilege exists.

**2.** As *Lake Country Estates*, —— U.S. at ——, 99 S.Ct. at 1179, makes clear, legislators need not be elected directly by the people to enjoy legislative immunity. They may be appointed, as in *Lake Country Estates*, or, as here, elected by the Virginia General Assembly. Va.Const. art. VI, § 7.

There is another fundamental basis for legislative immunity. This is the deeply imbedded doctrine of "separation of powers." The central place that legislative immunity holds in preserving effective separation of powers has been noted in Ervin, *The Gravel and Brewster Cases, An Assault on Congressional Independence*, 59 Va.L.R. 175, 181 (1973). Senator Ervin's article reiterates the historic basis and present necessity for a broad reading of legislative immunity and reminds us of its fundamental importance to our scheme of government.

The important role that legislative immunity plays in preserving separation of powers could not be better stated than it was by the Supreme Court in *United States v. Johnson*, 383 U.S. 169, 178–79, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1975).

> In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders. . . . The legislative privilege, protected against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the "practical security" for insuring the independence of the legislature.

Two crucial purposes then are served by legislative immunity: preservation of free and unhampered debate and decision making by the representatives of the people, and separation of powers among the various branches of government.[3]

### III

Case law has established that the common law legislative immunity applicable to State legislators and the constitutional legislative immunity that Congress enjoys by virtue of the speech and debate clause are the same in scope. *Tenney*, which reiterated the ancient doctrine of common law legislative immunity and which serves as the

modern landmark for any discussion of its scope and application, treats the constitutional and common law forms of legislative immunity identically. Its treatment of the history of the immunity illustrates that the constitutional immunity is an outgrowth and, in essence, is the constitutional embodiment of the common law privilege. *Tenney* discusses the constitutional and common law immunity interchangeably in applying the legislative immunity to members of the California legislature. Again, in discussing "the doctrine of legislative immunity, having its root as it does in the speech and debate clause of the Constitution," the Supreme Court looks to *Tenney* to define the scope of such immunity. *Dombrowski v. Eastland*, 387 U.S. 82, 84–85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967).

The Fourth Circuit has specifically held that the constitutional privilege has been extended to State legislators. In *Eslinger*, 476 F.2d at 228, the Court held that South Carolina legislators enjoy the same absolute legislative immunity as do members of Congress, extending even to immunity from suit itself. *U. S. v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973) also treats constitutional and common law legislative immunity identically. The Sixth Circuit in *United States v. Gillock*, 587 F.2d 284, 286 (6th Cir. 1978) takes a similar position.

Only the Third Circuit, in the factual context of requiring Pennsylvania State legislators to obey a subpoena duces tecum issued by a federal grand jury investigating racketeering, makes a distinction between the immunity enjoyed by members of Congress and that enjoyed by State legislators. *In re Grand Jury Proceedings*, 563 F.2d 577, 581 (3rd Cir. 1977). It is beyond argument that this Court is bound by *Tenney* and *Eslinger* as controlling authorities, not a Third Circuit case in a different factual context. Accordingly, I believe that the

---

**3.** The appeal to separation of powers as a basis for immunity is not a mere shibboleth or talisman. Despite the majority's undoubted adherence to the principle of separation, a substantial portion of the majority opinion is spent complaining about the defendants' failure to promptly amend the offending rule after its

constitutionality was implicated by *Bates*. The clear inference to be drawn from the majority plaint is that had the defendant, in its legislative capacity, bowed to the will of the courts, then they would not have been "punished" by the imposition of counsel fees, euphemistically labeled "costs."

scope of common law legislative immunity is identical to that of constitutional legislative immunity and that those legislating for the Commonwealth enjoy the same privileges in this regard as members of Congress.

Legislative immunity is the broadest sort of immunity. As Justice Frankfurter noted in *Tenney*: "the privilege would be of little value if they [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney*, 341 U.S. at 377, 71 S.Ct. at 788. The well-grounded fear of those who fought for and preserved legislative immunity is that those performing legislative functions, being merely human, might retreat from taking daring, innovative, or unpopular positions or, by contrast, might falter in adhering to long held principles, if faced with the "inconvenience and distractions of a trial."

As noted in the per curiam opinion in *Dombrowski*, 387 U.S. at 85, 87 S.Ct. at 1427:

> It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the speech and debate clause of the Constitution, *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1881) that legislators engaged in the sphere of legitimate legislative activity, *Tenney v. Brandhove, supra*, 341 U.S. at 376, 71 S.Ct. 783, should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.

The Supreme Court has recently reiterated this broad sweep of legislative immunity in *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975).

> Just as a criminal prosecution infringes upon the independence which the Clause is designed to preserve, a private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil ac-

tions also may be used to delay and disrupt the legislative function. Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperiled. We reaffirm that once it is determined that members are acting within the 'legitimate legislative sphere' the speech and debate clause is an absolute bar to interference.

The breadth of the immunity cannot be surpassed and the importance of its broad scope has been continually reiterated. There is no injunction—damages dichotomy. Neither form of relief is available. The Fourth Circuit understands this. In *Eslinger*, 476 F.2d at 228–30, the Court, while holding an employee of the South Carolina legislature liable to suit though immune from damages, held that the president pro tempore, various State senators, and the lieutenant governor were absolutely immune from suit, for injunctive relief as well as for damages.

The Supreme Court has not only continually reiterated this broad scope of legislative immunity but has explained it in terms of its origin. Legislative immunity is wholly different from judicial and executive immunity. In *Scheuer v. Rhodes*, 416 U.S. 232, 239–50, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) the Court discussed the different origins of each of the three types of immunities applicable to the different branches of government; legislative immunity, judicial immunity and executive immunity. It noted that executive immunity has traditionally been the most limited form while legislative immunity is absolute. In discussing the related subject of privilege from libel actions, Chief Justice Warren noted that "[t]he history of the privileges conferred upon the three branches of government is a story of uneven development. Absolute legislative privilege dates back to at least 1399. . . . The absolute immunity arising out of judicial proceedings existed at least as early as 1608 in England. But what of the executive privilege?" *Barr v.*

*Matteo,* 360 U.S. 564, 579–80, 79 S.Ct. 1335, 1343–1344, 3 L.Ed.2d 1434 (1959) (Warren, C. J., dissenting).

IV

The majority opinion in this case quotes from the Senate Committee report as follows:

[D]efendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of cost, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party). S.Rep.No.94–1011, at 5, U.S.Code Cong. & Admin. News, 1976, at 5913. (Footnotes omitted).

This language indicates that Congress intended for governmental officials who have been held liable for attorneys' fees to turn to the government that employs them to pay the needed money. Does this intention not to make the officials sued personally liable negate either the reasons for legislative immunity or the necessity that such immunity be of the broadest scope? I do not believe so.

That the Senate Report intends that officials liable for attorneys' fees be able to turn ·to their employer agency or government for succor does not guarantee that such help will be in all instances forthcoming. Thus legislators would not be certain of being able to turn to the State for the needed money and the inhibiting effect on them, deplored by all who enshrined the privilege in our jurisprudence, would be present. And as recently noted by the Supreme Court in *United States Servicemen's Fund,* 421 U.S. at 503, 95 S.Ct. 1813, the mere liability of the legislator to the annoyance of suit, not just the ultimate payment of money, has a disruptive and inhibiting effect on legislators. Even if the congressional committee envisions a "pass-through judgment" State policy may not willingly fall in line. *See, Hutto v. Finney,* 437 U.S.

678, 682, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522, 546 at n. 7 (Powell, J., dissenting) and at 550–1 (Rehnquist, J., dissenting) (1978). And if the State does comply with the federal vision, legislators would undoubtedly be subject to influence to avoid incurring the expense. Thus directly or indirectly the judiciary would hold unwonted sway over legislators. That such inhibiting effects are likely even if the government ultimately pays the judgment for attorneys' fees is sufficient to convince me that the centuries old policy reason for legislative immunity is not to be negated by any congressional intent to ultimately shift the payment burden to the State.

The fact that the legislator may turn to the State to collect the money to pay the plaintiff's attorneys' fees also in no way lessens the separation of powers rationale for the immunity. Whoever ultimately pays the attorneys' fees, the dangers inherent in a judicial ordering of such payment remains. Thus, whether Congress intended the legislator to pay the attorneys' fees or the State treasury to ultimately bear the burden, the policy behind legislative immunity and the necessity that such immunity be absolute would be severely impaired.

Historically, the broadest application of legislative immunity has been extended to those doing the legislating. In *Kilbourn, Tenney, Dombrowski, United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972) and *United States v. Gravel,* 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), the Supreme Court has recognized that those who are not legislating, *e. g.,* employees of the legislative branch, do not enjoy the same expansive scope of immunity enjoyed by legislators. Recently, however, in *United States Servicemen's Fund,* 421 U.S. at 507–508, 95 S.Ct. 1813, the Court extended absolute legislative immunity to the chief counsel of a legislative committee. The Court noted that aides who are essential to the legislative process are equally immune with those doing the legislating.

No matter what the scope of protection afforded to aides to legislators, it is the

Justices of the Supreme Court of Virginia in this case who have legislated and who are named as parties defendant. The full scope of legislative immunity applies to the Justices when acting in their legislative capacity, as here. Accordingly, I would hold that the Justices of the Supreme Court are entitled to legislative immunity, which is absolute, in this action.

### V

Since the majority believed this to be a case involving judicial immunity, it did not deal with the Act *vis-a-vis* legislative immunity. The Act reads as follows:

In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981–1983, 1985, 1986, 20 U.S.C. §§ 168 *et seq.*] or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or Title VI of the Civil Rights Act of 1964, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Since I hold that defendants were clothed with legislative immunity it is necessary that I address the question: Does this statute abrogate legislative immunity?

The question involves, inter alia, fathoming the intent of Congress when it enacted the statute. *Tenney,* in considering the impact of 42 U.S.C. § 1983 on legislative immunity, looked to the intent of Congress when it passed the Civil Rights Act of 1871. Here we must look to the intent of Congress when it passed the Civil Rights Attorney's Fees Award Act. I think Congress neither intended to abrogate legislative immunity nor had any reason to do so since legislative immunity does not frustrate any congressional objective embodied in the Act.

The words of the statute itself say nothing about immunities, legislative or otherwise. However, as my purpose is to discern the intent of Congress, I have searched the debates and committee reports for the light they throw on Congress' intent.

The only portion of the legislative history which directly mentions immunities is in the House report from the Committee on the Judiciary. On page 9 the report reads as follows:

Furthermore, while damages are theoretically available under the statutes covered by H.R. 15460, it should be observed that, in some cases, immunity doctrines and special defenses, available only to public officials, preclude or severely limit the damage remedy.[17]

Footnote 17 reads as follows:

*Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). H.Rep.No.94–1558, at 9, 1976.

This language establishes that the House Judiciary Committee believed that the language of the bill would, to some extent, override immunities. The only indication of which immunities the House Judiciary Committee had in mind is furnished by the cases noted in footnote 17.

*Wood* dealt with the immunity enjoyed by school officials, in particular school board members. In deciding the proper scope of their immunity, the Supreme Court was considering the proper scope of executive immunity. The opinion in *Wood* specifically distinguished executive immunity from the stronger legislative and judicial immunities. *Wood,* 420 U.S. at 316–17, 95 S.Ct. 992.

In *Scheuer* the Court was again construing the proper scope of executive immunity. The Court specifically noted that legislative immunity is far stronger and more encompassing than executive immunity. *Scheuer,* 416 U.S. at 240–41, 94 S.Ct. 1683.

Finally, the House Judiciary Committee report cites *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *Pierson* dealt with the scope of immunity appropriate to judges acting in their judicial capacity and to police officers acting in their executive capacity. *Pierson* does not consider or mention the matter of legislative

immunity. Thus the cases cited by the committee not only did not deal with legislative immunity, two out of the three specifically called attention to the fact that legislative immunity is qualitatively different from executive and judicial immunity.

It must be recalled from the discussion above that legislative immunity is qualitatively different from the other immunities; it serving as a shield from suit itself. *United States Servicemen's Fund,* 421 U.S. at 503, 95 S.Ct. 1813; *Dombrowski,* 387 U.S. at 85, 87 S.Ct. 1425. And it can only be assumed that Congress, itself entitled to the immunity, understood this when legislating and would not have abrogated such a privilege by a non-specific reference in a committee report.

There are other indications from the congressional debates that the radical change required for plaintiffs to recover was not intended by the Congress. Senator Kennedy, sponsor of the legislation, explained its purpose as restoring the law to its "pre-*Alyeska*" state.[4] *Alyeska Pipe Line Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Specifically Senator Kennedy noted, "This bill would close a series of loopholes in our civil rights laws created by the Supreme Court's *Alyeska* decision last year". 122 Cong.Rec. S 516251–52 (1976). This was echoed by Senator Mathias, Republican member of the Senate Judiciary Committee and a strong supporter of the legislation. Senator Mathias noted that,

> The need for this bill arises from a recent Supreme Court decision which has erected a formidable financial barrier against those seeking access to Federal courts and has consequently dealt a serious blow to the effective enforcement of our civil rights laws . . . I believe that S. 2278 [the legislation in question] consti-

tutes a much needed response to *Alyeska* and is necessary to guarantee the proper enforcement of our civil rights laws which the Congress has so earnestly labored for in the past. 122 Cong.Rec. S 16251 (1976).

Reading through the House and Senate debates as well as the House and Senate committee reports gives me the clear impression that the purpose of the legislation was to return the law to what Congress considered it to be prior to *Alyeska*.[5] Had Congress intended to do more, there would be evidence in the record.

There is no logical reason for Congress to have intended to override legislative immunity because no objective that Congress had in mind when it passed the Civil Rights Attorney's Fees Awards Act is frustrated by legislative immunity. Congress intended to encourage the private enforcement of the civil rights statutes. 122 Cong.Rec. S 16252 (1976).

The failure to enforce civil rights laws and the enforcement of laws and customs which violate civil rights is activity, or lack thereof, engaged in by those enforcing the laws or those interpreting the laws; that is, those acting in an executive or judicial capacity. Here, it is the Virginia State Bar that has acted to enforce the law. So in all cases there must be someone enforcing the law, or failing to, and it is that enforcing official who may properly be sued. Thus, the vindication of civil rights by private enforcement that Congress intended is accomplished by suit against those acting in an executive and, sometimes, judicial capacity. Even where a law is on the books which is not being enforced but the possibility of enforcement chills the exercise of rights, it is the official with the power to enforce who can give the plaintiff the relief he seeks: assurance against enforcement.

---

4. It is interesting to note that the Supreme Court considered the question in *Alyeska* to be whether it should formulate new law concerning attorneys' fees or whether it should affirm the "American" rule. The Court chose not to change the law and re-affirmed the traditional "American" rule. *Alyeska,* 421 U.S. at 277, 95 S.Ct. 1612.

5. See: S.Rep.No.94–1011, at 1, 4, 1976; 121 Cong.Rec. S 14975 (1975); 122 Cong.Rec. S 16251, S 16252, S 16254, S 16431, S 16432, S 16492, S 16664, S 17052 (1976); H.Rep.No.94–1558 at 2, 1976; 122 Cong.Rec. H 12150, H 12151, H 12154, H 12155, H 12159, H 12160, H 12161, H 12162, H 12163, H 12164, H 12165 (1976).

Thus the absence of a right to counsel fees against those acting in a legislative capacity in no way negates what Congress intended. Accordingly, there is no logical reason to assume, especially since no other indications are present, that Congress intended attorneys' fees to be collected against those who enacted the law no matter what their motive.

In summary, there is no specific language in the statute that evidences any intent on the part of Congress to abrogate legislative immunity, no indication that the language of the House Committee Report applies to legislative immunity, no indication that Congress intended to do more than return the law to what it considered it to be prior to *Alyeska,* and no policy reason for awarding attorneys' fees against those acting in a legislative capacity since plaintiffs can in a proper case be awarded fees from the executive officials who are depriving plaintiffs of their rights. Accordingly, I am convinced that Congress did not intend to abrogate legislative immunity in regard to the award of attorneys' fees.

That Congress' intent was not to abrogate legislative immunity in this case is bolstered by my opinion that to do so could raise a constitutional question. In *Tenney,* Justice Frankfurter raised that constitutional question. "Let us assume, merely for the moment, that Congress has constitutional powers to limit the freedom of State legislators acting within their traditional sphere. That would be a big assumption." *Tenney,* 341 U.S. at 376, 71 S.Ct. 783. I do not think that this Court should make that "big assumption" nor can I assume that Congress intended to raise that question when passing the Act. Had Congress thought that the Act raised constitutional problems by abrogating legislative immunity the subject would most likely have arisen somewhere in committee or on the floor.

Just this term in *NLRB v. Catholic Bishop of Chicago,* —— U.S. ——, ——, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533, 541 (1979), the Supreme Court again emphasized that only when "the affirmative intention of Congress clearly expressed" requires a con-

stitutional resolution, should the courts assume there is a constitutional question. Unless the congressional interest necessarily raises a constitutional issue, the enactment should be construed in such a way as to avoid any conflict between the statute and the Constitution. In *Catholic Bishop of Chicago,* —— U.S. at ——, 99 S.Ct. at 1322, 59 L.Ed.2d at 545, the Court said, "we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Catholic Bishop of Chicago,* —— U.S. at ——, 99 S.Ct. at 1322, 59 L.Ed.2d at 545. So here I think we should construe the Civil Rights Attorney's Fees Awards Act in a manner that avoids raising a constitutional issue involving legislative immunity. Accordingly, for the additional reason that to hold otherwise would raise a constitutional issue, I am convinced that Congress evinced absolutely no intention of abrogating legislative immunity by the passage of this statute.

### VI

I believe that the above discussion amply demonstrates that the Supreme Court of Virginia is immune from an award of attorneys' fees in this action by reason of its legislative immunity. I believe that the foregoing discussion represents accurately the state of the law on this question. However, the Supreme Court of Virginia has never raised its legislative immunity as a bar to suit in some four years of litigation in this case. If the failure so to raise legislative immunity constitutes a waiver of that defense, then the Supreme Court may be held liable for attorneys' fees despite its immunity as described above.

Two considerations militate against a waiver in this case. First, I believe that the legislative immunity which protects the Supreme Court in this action "sufficiently partakes of the nature of a jurisdictional bar" that it may and should be raised by this Court *sua sponte. See Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Jacobson v. Tahoe Regional*

*Planning Agency,* 566 F.2d 1353, 1361 (9th Cir. 1967), *rev'd. in part and aff'd. in part sub nom. Lake Country Estates, Inc.· v. Tahoe Regional Planning Agency,* —— U.S. ——, 99 S.Ct. 1171, 59 L.Ed.2d 461 (1979). I have already discussed the nature of legislative immunity and have shown how legislative immunity differs in quality from both executive immunity and judicial immunity. Legislative immunity is grounded in the nature of the relationship between the coordinate branches of government in our republican system, whether on the federal or State level. Legislative immunity, as I have shown, is immunity from suit and not merely immunity from damages. In this way, it partakes of a jurisdictional bar and can be raised at any time in the litigation of the case, and may also be raised *sua sponte* by the court at any time.

The second reason that I am reluctant to find a waiver in this case is that legislative immunity is one which belongs to the public and is designed for the protection of the public. The policy which underlies legislative immunity has been explored at length above. It is my view that such an important immunity, rooted in the ancient precepts of the common law, embodied in the federal Constitution, and so necessary to the orderly functioning of a republican form of government, may not be waived by inadvertence or mistake. It is of such a nature that it may be waived only by a willful, knowing, and deliberate act of waiver. It appears that legislative immunity was not raised by the defendant Supreme Court of Virginia simply because the possibility of the highest court of the State invoking legislative immunity did not occur to those to whom the defense of this action was entrusted. This cannot be described as a knowing, willful, and deliberate waiver.

Furthermore, in *Eslinger,* 476 F.2d at 228, the Fourth Circuit rejected an argument that the defendants had waived their immunity by their failure to allege it formally in their answers to the complaint and the

amended complaint. Thus, there is no requirement that legislative immunity be raised in the pleadings. It is sufficient that the question of immunity be raised before the trial court. 476 F.2d at 228. It is my view that in raising judicial immunity, which the Supreme Court did with vigor, the Supreme Court placed the question of its immunity squarely before this Court. The defense raised was one of immunity. The authority cited, according to the majority, did not support the immunity claimed, but other authority existed that amply supports the immunity to which defendant is entitled. It would be extremely harsh for this Court to hold the Supreme Court of Virginia to some sort of election of defenses with respect to immunity. Accordingly, I believe that the Supreme Court should not be held to have waived its legislative immunity in this case.[6]

### VII

I have heretofore indicated my reasons for believing that the Supreme Court of Virginia should not be required to pay plaintiff's attorneys' fees in this case. I have concurred in the majority view that the Virginia State Bar should not be held liable. The final question which remains is whether or not this Court is empowered to award attorneys' fees directly against a State in a case where such an award against the agency or officials of the State involved in the law suit is not appropriate, and in which the State itself is not a party.

This question arises out of some remarkable dicta found in the five-man majority opinion in *Hutto v. Finney,* 437 U.S. 678, 700, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In *Hutto,* the Supreme Court affirmed an award of attorneys' fees against certain named officials of the Arkansas Department of Corrections. After discerning that it was "obvious" that the award would be paid with State funds, the majority went on to indicate that the Arkansas Department

---

6. Since I would hold that the Supreme Court of Virginia has not waived its legislative immunity, the Supreme Court of Virginia should be dismissed from this action entirely. I therefore

dissent from the entry of any order against the Supreme Court, and I would dismiss the Supreme Court as a party to this action with its costs.

of Corrections, a non-party, was the entity intended by Congress to bear the burden of the award.

The *Hutto* result was reasoned from the language of the Senate committee report relied on by the majority in this case. In addition, the *Hutto* majority discussed as a basis the distinction between one sued in his official capacity and in his individual capacity. From these, the Supreme Court determined that Congress intended a non-party Stage agency, or the State itself, to be liable for counsel fees incurred by errant officials.

Though the distinction between a person's official capacity and his individual capacity is not so obvious to me as it is to Mr. Justice Stevens, I acknowledge that this inferior court must apply the reasoning of *Hutto* in a proper case. But *Hutto* is not this case.

There, the State of Arkansas was held liable for attorneys' fees in a derivative manner: defendant State official Hutto was legally liable, ergo the State was legally liable. In this case legislative immunity prevents the award of attorneys' fees against the Supreme Court of Virginia. Applying the principle of *Hutto,* that the State is derivatively liable for the activities of its officers, leads me to conclude that the Commonwealth cannot be held liable for attorneys' fees when the defendant Supreme Court of Virginia cannot be held liable. *Hutto* stands for the proposition that *if* the Supreme Court of Virginia were liable, the Commonwealth, even though a non-party, would be liable. Accordingly, I believe that *Hutto* does not require or allow this Court to award attorneys' fees against the Commonwealth when this Court does not have the power to award attorneys' fees against the Supreme Court of Virginia.

I have already discussed my view that an award of attorneys' fees against the State on account of purely legislative activity is utterly inconsistent with the concept of legislative immunity. Just as Congress did not intend to disturb legislative immunity in passing the Act, so it did not intend to permit awards of attorneys' fees against

States on account of legislative activity. It is true that in *White v. Crowell,* 434 F.Supp. 1119 (W.D.Tenn.1977), a case cited by the majority, the Court awarded attorneys' fees against the State of Tennessee for a purely legislative act; a change in the apportionment of State legislative districts. It is not clear from the opinion whether the State of Tennessee was a named party defendant. The only named defendant which can be found in the report of the case is the Secretary of State of Tennessee. *White* is entirely devoid of reasoning to support an award of attorneys' fees against a non-party for purely legislative activities, and I do not believe it is a very instructive case.

Nor do I believe that the Commonwealth of Virginia may properly be held liable for attorney's fees where the Court has already found that special circumstances make an award of fees against the Virginia State Bar unjust. I agree with the holding of the majority that in the absence of special circumstances the Virginia State Bar would be liable for attorneys' fees. It may very well be that the Commonwealth of Virginia would have to pay such fees if awarded, and I do not doubt that the Commonwealth would in fact pay such a fee if ordered to do so by this Court. However, I believe that the Commonwealth is entitled to the benefits of the proper behavior of its officers and agencies just as it is subject to liability for their unlawful behavior. As I have explained above, I do not believe that anything in either *Hutto* or in the legislative history of the Act, properly understood, is intended to subject States to awards of attorneys' fees unless some agency or official of the State is first held liable. Accordingly, as special circumstances render an award against the State Bar unjust, such an award against the State would not be proper.

In conclusion, I believe legislative immunity does not allow this Court to award attorneys' fees against the Supreme Court of Virginia. Special circumstances make such an award against the State Bar unjust. *Hutto* and the legislative history allow an award against a State only when some offi-

cial or agency of the State is first held to be liable. No official or agency of the State can be held liable for counsel fees in this case. The Commonwealth, therefore, cannot be held liable.

### VIII

Finally, I would hold that, even if the Court were empowered to award attorneys' fees against the Supreme Court of Virginia, special circumstances render such an award in this case unjust. There is not now nor has there ever been any appropriate suggestion that any of the defendants acted in bad faith in enacting the Rule or with regard to any aspect of this litigation. While it is scarcely necessary to emphasize here that a finding of bad faith is not necessary to an award of attorneys' fees, a party's good faith is nevertheless a factor which the Court may consider in determining whether an award of fees is appropriate.

Here, the majority frowns upon the Supreme Court for its failure to amend DR2–102(A)(6) to conform with certain ABA and VSB proposals and for its failure to amend the rules since the decision in *Bates.* It is my view that this language in the majority's opinion represents a stark example of the dangers inherent in any relaxation of the ancient rule of legislative immunity. The majority has taken it upon itself to criticize the Supreme Court of Virginia for its failure to conform to the majority's idea of the course a lawmaking body should follow. The majority appears to be applying a bad faith standard to the Virginia Supreme Court when it declares that it will order the Supreme Court to pay attorneys' fees because of "their continued failure and apparent refusal to amend State Code DR2–102(A)(6) to conform with constitutional requirements." Majority op. at 1069. This kind of inquiry by the courts into the legislative process is inimical to the separation of powers and the republican form of government and precisely the kind of behavior which absolute legislative immunity is intended to avoid.

Despite the appearance of a bad faith standard, I do not believe that the majority intended to imply that the Supreme Court of Virginia is guilty of bad faith in this matter. The questions surrounding advertising by attorneys are grave questions of public policy. They are not simple and they are not cut and dried. When confronted with the constitutional challenge to these regulations, this Court responded with three separate opinions and the Supreme Court responded with four separate opinions. No one pretends that the Supreme Court's opinion in *Bates* answered all of the questions which exist with respect to the proper scope of State regulation. Under these cir-cumstances, I do not believe that the failure of the Supreme Court of Virginia to act in 1976, or its failure to act since June 1977, in any way bears upon the justness of an award of fees against that Court.

In my view, such an award would be extremely unjust. The ban on professional advertising by lawyers is time honored. It was embodied in Canon 27 of the *Canons of Professional Ethics of the American Bar Association* in 1908. This Canon remained essentially unchanged, though amended more often than any other Canon. Its precept was carried over into the relatively recently enacted Code of Professional Responsibility. Challenges to the advertising ban, by contrast, are of very recent origin. I believe that the antiquity of the ban and the unsettled character of the new rules, even at present, are factors which weigh against the award of attorneys' fees in this case, just as they did in *Chastang v. Flynn & Emrich Co.,* 541 F.2d 1040, 1045 (4th Cir. 1976).

Furthermore, I believe that it is highly unseemly for this Court to award attorneys' fees against the Supreme Court of Virginia, a court of greater dignity. The idea of this Court issuing an order to the Supreme Court of Virginia ordering that Court to pay money to a litigant in this Court seems to me utterly inconsistent with the concepts of comity and federalism which are central to our form of government. I would not favor it except in those cases in which a citizen's rights under the federal Constitution could not otherwise be vindicated. I

believe that such a case would be an extreme case, and I do not believe that we are faced with it at this juncture. Accordingly, even if the majority were correct in its view of the law applicable to this case, I would still dissent from an award of attorneys' fees against the Supreme Court of Virginia.

For these reasons, I respectfully dissent from the decision of the majority.